PER CURIAM.
This is an appeal by the plaintiffs, Charles W. and Hilda F. Musselman, of a summary judgment entered in favor of the defendant, Colonial Bank of North Alabama, formerly d/b/a The Bank of Huntsville (“Bank”). That judgment was made final pursuant to Rule 54(b), A.R.Civ.P. We reverse and remand.
The issues are whether the Musselmans waived any claims they had against the Bank by renewing a promissory note to the Bank and whether the conflicting nature of the testimony presented by the plaintiffs and the defendant precluded summary judgment.
The plaintiffs stated the following claims in their complaint:[1]
“1. That defendant committed fraud, misrepresentation and deceit through its preferential treatment of D.L. Putman, a director of the Bank, by selling him the inventory and accounts receivable and not crediting those payments to plaintiffs’ indebtedness. Plaintiffs maintain that such sales would have eliminated their indebtedness to the defendant.
“2. That defendant acted in a tortious manner by using economic duress to force plaintiffs to submit to the ‘voluntary foreclosure’ of May 11, 1982, in an effort to harm plaintiffs and assist or treat preferentially D.L. Putman.
“3. That defendant committed a tor-tious and intentional interference with plaintiffs’ business by its actions of foreclosure, economic duress, pressure and the preferential sale to D.L. Putman of the inventory and accounts receivable. “4. That defendant had a fiduciary relationship with plaintiffs and that it used that relationship in an improper manner and committed fraudulent concealment and fraud in its improper and fraudulent handling of the accounts receivable so as to prevent the application of those payments made for the accounts receivable to reduce or extinguish plaintiffs’ indebtedness to defendant.
*974 “5. That defendant has acted in a tor-tious and outrageous manner in its attempt to ruin plaintiffs financially and take their business assets, expectations and homeplace.
“6. That defendant has committed conversion of money and assets due to be applied to plaintiffs’ indebtedness.
“7. That defendant has been negligent and/or wanton in its mishandling of accounts receivable paid and not properly credited to plaintiffs’ indebtedness.
“8. That defendant has breached its implied and express contracts with plaintiffs to apply accounts receivable paid or received to plaintiffs’ indebtedness.
“9. That defendant violated its own internal policies and federal regulations in an effort to harm plaintiffs and to the benefit of one of its directors in a tor-tious manner.
“10. That defendant entered into a civil conspiracy with D.L. Putman to accomplish the acts set forth above.
“11. Plaintiffs maintain that defendant disposed of collateral owned by plaintiffs but pledged to defendant in a commercially unreasonable manner by selling the accounts receivable to a director of the Bank as described earlier. Moreover, those accounts receivable were then allowed to be pledged [so] as to secure a note for an entity which was fictitious. The day after the bill of sale was signed, a promissory note was taken out by Common Sense Computer Systems, Inc. for $225,000.00 which pledged as collateral these accounts receivable.”
The facts, as presented by the Mussel-mans and the Bank, are in conflict. The facts, viewed in a light most favorable to the Musselmans (against whom the summary judgment was sought), are as follows:
Charles Musselman was the primary stockholder and president of a computer software company named Office Systems of America, Inc. (“OSA”). In 1981, OSA received several loans and letters of credit from The Bank of Huntsville. From March 1981 to June 1981, OSA’s indebtedness to the bank increased from $300,000 to $585,-000. During that same period, OSA’s financial condition began to deteriorate. Musselman met with the president of the Bank, Joe Weed, to discuss the possibility of receiving additional loans from the Bank. According to Musselman, Weed suggested that he approach D.L. Putman, one of the Bank’s directors and OSA’s landlord, about Putman’s becoming an investor in OSA. Musselman met with Putman the following day. Putman agreed to become a partner with Musselman, and Musselman reported this to Weed. After Putman became Musselman’s partner, OSA’s liabilities increased substantially. Meanwhile, the relationship between Putman and Mus-selman began to deteriorate.
In January or February 1982, Mussel-man, Putman, and Weed met to discuss a lawsuit that was pending against OSA. Musselman alleged that, during this meeting, Putman presented a plan to cause OSA to become bankrupt and to transfer its assets to a corporation named Furniture Information Systems, Inc. (“FIS”). The ownership of FIS would be transferred from Musselman to Putman. The transfer of a portion of the OSA assets would be accomplished by OSA's defaulting on the money it owed the Bank, turning over certain of its assets to the Bank as collateral, and then allowing FIS, at an undetermined time, to repurchase the assets. Musselman claims that Weed told Putman that he could not agree to such a deal because it was fraudulent, but that Putman angrily responded that the Bank’s board of directors had already agreed to accept the proposal. Weed assented to the proposal.
Musselman contended that he had objected to the proposal because he felt that OSA would prevail in the lawsuit against it. Musselman argued that he had agreed to go along with Putman’s proposal for the Bank to foreclose on the assets of OSA because he was pressured into doing so and he had needed to “buy some time.” He said that he had felt pressured, because, at or about the time of this alleged fraudulent proposal, he and his wife had pledged their home to the Bank as collateral on one of the notes. Musselman stated that Weed and Putman told him not to worry about *975 his house because the note on which the house had been pledged as collateral would be paid off.
In May 1982, Putman acquired 100% ownership of FIS. On the same day, OSA surrendered to the Bank its accounts receivable, equipment, and inventory. As of that date, OSA’s indebtedness to the Bank was approximately $726,000.
On May 14, 1982, Musselman filed a petition for bankruptcy. Nearly three weeks later, FIS signed a contract with the Bank to allow FIS to collect the accounts receivable owned by the Bank and to allow FIS to keep 30% of anything it collected.
On June 14, 1982, the Bank’s officer loan committee (of which Putman was a member) met, discussed, and ratified the collection agreement between the Bank and FIS.
On August 16,1982, Putman and Mussel-man signed an agreement whereby Putman would assume all of OSA’s liabilities, except the note that was secured by Hilda Musselman’s house. (Musselman had transferred his interest in the house to his wife because of the threat of being sued personally.) Putman also agreed to pay $2,000 per month for six months on the note secured by the Musselmans’ house. After this, OSA would pay $2,000 per month until the note was paid (if OSA was earning $2,000 per month).
On August 30, 1982, the Bank, as evidenced by a bill of sale signed by its president, Weed, sold the inventory that OSA had surrendered to it on May 11, 1982, to FIS for $243,154.77. The sale of this inventory was reflected by Putman’s personal guarantee to pay off the $243,154.77.
In another bill of sale signed by the president, Weed, and dated the same day, OSA’s accounts receivable were sold by the Bank to FIS for $158,513.31. Weed later denied that the sale of the accounts receivable to Putman ever took place. Mussel-man contended that Putman (and FIS) never signed a note to pay the Bank for the transfer of the accounts receivable. Mus-selman further argued that the Bank kept this transfer a secret and that it never intended to give him credit on his note, which was secured by his house, as the August 16, 1982, agreement between Put-man and Musselman required. Weed testified in his deposition that the proceeds from the sale of the accounts receivable were to go towards paying off the Mussel-mans’ loan.
Current and former Bank employees gave conflicting testimony about the documents and transactions concerning the sale of the accounts receivable. President Weed stated, contradicting his earlier statements, that the accounts receivable had never been sold. His secretary at that time stated that she typed up the bills of sale that were to go to Putman. She stated that, although she typed a note to pay for the inventory, she did not type one for the accounts receivable. The Bank’s compliance officer, Loma Jo Bridges, stated that she was told by Weed that the parties voided the bills of sale. The Bank’s auditor, George Walker, testified that Weed had told him that the accounts receivable were sold to FIS because OSA had a “bad name.” The chairman of the Bank’s board of directors, William Collins, stated that the accounts receivable had been sold to Common Sense Computers, Inc. (the successor corporation to FIS).
On April 1, 1983, when the balance on the note secured by the Musselmans’ house came due, the Musselmans renegotiated and signed another note for $134,174.63.
On appeal, Musselman contends that the record is replete with evidence of insider trading and preferential treatment by the Bank in favor of its director, D.L. Putman, and that only through discovery was he able to uncover numerous acts of deception on the part of the Bank. Specifically, Mus-selman argues that the Bank had surrepti-tiousily hidden a $158,000 bill of sale for accounts receivable, payment of which should have extinguished the $134,174.63 note that was secured by Musselmans’ house.
Essentially, Musselman maintains that there were four notes outstanding, three of which had been personally guaranteed by D.L. Putman, the fourth having been personally guaranteed by Musselman. Mus- *976 selman readily admits that he renewed the note, but he claims that he did so under the threat of losing his house and without knowledge that the accounts receivable had been fraudulently sold.
Musselman insists that the Bank falsely induced him to agree to a “voluntary foreclosure” on May 11, 1982, whereby he released his accounts receivable and inventory to the Bank. He argues that the Bank sold the inventory for approximately $243,-000, and Musselman claims that the sale of the inventory completely paid off the three notes on which Putman was the guarantor, but that none of the money from the sale of the inventory was applied to Mussel-man’s note. Musselman says that he later discovered that the accounts receivable had also been sold for approximately $158,000 and yet nothing was ever applied to the note secured by the house. Musselman maintains that the receipt of the money from the sale of the accounts receivable constituted an effective accord and satisfaction of his $134,174.63 debt. In essence, Musselman argues that while he twice renewed the note on which his house was pledged, he did so under the mistaken belief that the accounts receivable had not been sold, and he argues that he was not privy to all the essential facts when he renewed the note and, therefore, should not be precluded from asserting the tort claims against the Bank.
The Bank argues that the Musselmans waived any claims they might have had against it when they renewed the note on April 1, 1983, because, at that time, they had knowledge of the board of directors’ actions with regard to the accounts receivable.
In Holczstein v. Bessemer Trust & Savings Bank, 223 Ala. 271, 278, 136 So. 409 (1931), this Court held that when a party alleged fraud after renewing a note, “the subsequent renewal of the note after knowledge of said fraud was a waiver of the defense.” The Bank argues that the Musselmans fully intended to sue the Bank prior to the April 1, 1983, renewal of the note. The Bank further contends that the Musselmans knew that they were going to sue the Bank, and were going to sue on the very claims now being made for fraud, breach of contract, and mishandling of collateral.
The deposition of Charles Musselman reveals that he was uncertain about what had transpired with the accounts receivable:
“A: Okay. But let me answer. But I did not know what had happened to the receivables. That has nothing to do with receivables.
[[Image here]]
“But I was still in hopes that the accounts receivable and the things would be collected and paid off. I knew I couldn’t pay for it, making the kind of money that I made.
“Q: You knew that the inventory had not been sold?
“A: The bank still owned it, so Joe said.
[[Image here]]
“A: No, sir. If I did, I don’t remember. Because until we saw those bill of sales, about a year and a half later, we had no earthly idea. Because, again, Joe Weed’s testimony in October of ’83, he testified the bank still owned that stuff. I believe I am correct in that. I may not be, but I think I am.”
The deposition testimony of Musselman and his auditor that the Bank cites to show that Musselman knew of the fraud is not conclusive. Although it does conclusively show that Musselman and his wife intended to sue, it does not show that either of them knew what had happened to the accounts receivable. In fact, the Bank’s chairman of the board, its president, its president’s secretary, its compliance officer, and its auditor each had a different account of what happened to the accounts receivable. The affidavit in which Weed denied that the accounts receivable were sold to Putnam was not filed until 1986. Thus, the alleged pattern of deception was not concluded until well after the suit was filed.
Because of the substantial conflicts in the facts as given by the employees of the Bank and by the Musselmans, we hold that there are genuine issues of material fact as *977 to all counts, and, therefore, summary judgment was improper. Booth v. United Services Automobile Ass’n, 469 So.2d 1281, 1282 (Ala.1985). Rule 56(c), A.R. Civ.P.
The judgment is reversed and the cause is remanded.
REVERSED AND REMANDED.
HORNSBY, C.J., and JONES, SHORES, ADAMS, HOUSTON and KENNEDY, JJ., concur.
MADDOX and STEAGALL, JJ., dissent.

. Plaintiffs filed suit on May 10, 1983, and amended the complaint on September 10, 1985.