693 So.2d 409 (1997)
FOREMOST INSURANCE COMPANY, GRAND RAPIDS, MICHIGAN; and Foremost Signature Insurance Company
v.
Reginald Eugene PARHAM, et al.
FOREMOST INSURANCE COMPANY, GRAND RAPIDS, MICHIGAN; Foremost Signature Insurance Company
v.
Mary MASSEY.
1950507, 1951238.
Supreme Court of Alabama.
March 14, 1997.
Rehearing Denied May 9, 1997.
*413 Robert W. Bradford, Jr. of Hill, Hill, Carter, Franco, Cole & Black, P.C., Montgomery; and E. Elliott Barker of Pilcher & Pilcher, P.C., Selma, for appellants.
Jere L. Beasley, Frank M. Wilson, and P. Leigh O'Dell of Beasley, Wilson, Allen, Main & Crow, Montgomery; and Lynn W. Jinks III of Jinks, Smithart, Jackson & Daniels, Union Springs, for appellees.
HOUSTON, Justice.
The defendants, Foremost Insurance Company, Grand Rapids, Michigan, and Foremost Signature Insurance Company ("together hereinafter referred to as `Foremost'"), appeal from a judgment entered in this fraud case on separate jury verdicts for the plaintiffs, Reginald and Patricia Parham ($3,500 in compensatory damages and $3,000,000 in punitive damages on their misrepresentation claim and $3,000 in compensatory damages and $4,500,000 in punitive damages on their suppression claim) and Mary Massey ($3,000 in compensatory damages and $3,000,000 in punitive damages on her misrepresentation claim and $3,000 in compensatory damages and $4,500,000 in punitive damages on her suppression claim). We affirm conditionally.
This fraud action arose from separate purchases of mobile homes by the Parhams and Massey. The evidence, viewed in the light most favorable to the plaintiffs, shows the following: The plaintiffs purchased their mobile homes from C & C Manufactured Homes, Inc. ("C & C"). The Parhams purchased their mobile home on July 24, 1989, and Massey purchased her mobile home on February 5, 1990. In addition to selling them their mobile homes, C & C, through its sales representative, Robert Banks, sold the Parhams a Foremost mobile home homeowner's insurance policy, and sold Massey a similar policy. The plaintiffs financed their mobile homes, and insurance was required under the terms of their financing agreements. Foremost offered this insurance through C & C at the time of the sale of the mobile homes, even though C & C and its employees were not licensed by the Alabama Department of Insurance to sell such insurance. Foremost had provided C & C with applications, rate charts, worksheets, and written instructions describing how to fill out the forms. Although Foremost also did business through a licensed insurance agency in Guntersville, the Manning Agency, Inc., that agency, which was shown on one of the plaintiffs' sales documents as the agency servicing the policies, generally had no contact with *414 potential insureds. Instead, it performed the limited function of reviewing applications prepared by C & C and then forwarding them on to Foremost. C & C and Banks split a sales commission on the plaintiffs' policies with the Manning Agency. John Manning, the owner of the Manning Agency, testified that it was illegal for a licensed agent to split a sales commission with an unlicensed agent. Foremost's district manager, Douglas Carmichael, testified that he had recruited C & C to solicit applications for Foremost insurance policies. Carmichael also testified that no representative of C & C was licensed to sell insurance at the time the plaintiffs purchased their policies and that he was aware of that fact; that he suspected that sales commissions were being split with an unlicensed agent; and that C & C had sold Foremost insurance policies for at least six years before it finally obtained a license from the State.
Banks orally represented to the plaintiffs when they purchased their policies that their first year of coverage would not require the payment of a premium. However, the plaintiffs signed and were provided with various sales documents (e.g., a purchase agreement; a credit installment contract; an invoice and bill of sale; and a Foremost mobile home homeowner's worksheet), all of which indicated that premiums were charged for the first year's coverage$499 with respect to the Parhams and $397 with respect to Massey[1] and that the amount of those premiums had been included in the total amount financed by the plaintiffs in connection with the purchase of their mobile homes.[2] The plaintiffs relied on Banks's representation and signed these documents without reading them. Patricia Parham had completed high school. At the time of the trial, she was a corrections officer with the Bullock County Correctional System and a student at Troy State University in Montgomery, studying to be a registered nurse. Mary Massey had completed the 10th grade and part of the 11th grade and had later earned her GED or high school equivalency certification. At the time of the trial, she had been employed for 15 years as a materials handler at Cooper Lighting Company. Reading is one of her hobbies.
The evidence also indicates that of the several coverages provided by the plaintiffs' policies (e.g., mobile home, personal effects, personal liability, etc.) one was for damage to "adjacent structures." The policy states:
"We will pay for direct, sudden and accidental loss of or damage to:
"Adjacent structures you own on your premises which are separated from the home by a clear space; or
"Structures connected to the home by only a fence, utility line or similar connection are adjacent structures."
Banks quoted a single premium to the Parhams and a single premium to Massey, and sold each of the policies as a mobile home homeowner's "package policy," i.e., a policy containing multiple coverages (mobile home, adjacent structures, personal effects, personal liability, and medical payments) sold for a single premium. However, Foremost allocated a separate premium amount for each of the coverages, including the adjacent structures coverage. Banks did not ask the plaintiffs whether they had a need for any of the multiple coverages, including adjacent structures coverage, and he did not tell them that the coverage for adjacent structures could be dropped with permission from Foremost's underwriting department, with a corresponding reduction in the premiums (about $40 with respect to each policy), if they did not want or need that coverage.[3] When the Parhams *415 later received their policy, the declarations page showed that "INCL" had been typed on the line under "Adjacent Structures $3,000," indicating that coverage for damage to adjacent structures up to $3,000 was included. The declarations page of Massey's policy showed that "INCL" had been typed on the line under "Comprehensive Adjacent Structures $2,700," indicating that coverage for damage to adjacent structures up to $2,700 was included. The plaintiffs did not read their policies. When they purchased their mobile homes, the plaintiffs did not want adjacent structures coverage; however, while Massey's policy was in force, she did acquire a satellite dish that was protected by this coverage. A marketing survey that Foremost had prepared indicated that a significant percentage of mobile home purchasers in Alabama in 1987 and 1990, possibly in excess of 50%,[4] did not have certain adjacent structures and that many mobile home purchasers might not want or really need such coverage.
The plaintiffs filed this action on May 13, 1994, alleging misrepresentation (no premium for the first year's coverage) and suppression (failure to disclose that coverage for "adjacent structures, personal liability, medical payments, or damage to property of others" was included in the policy and that a specific portion of the total premium was allocated for each of those coverages) and seeking both compensatory and punitive damages. The thrust of the suppression *416 claim that was actually submitted to the jury, as we understand it, was that the plaintiffs were not given sufficient information to enable them to make a decision as to whether they wanted to purchase adjacent structures coverage. The plaintiffs' allegations concerning the nondisclosure of coverages for personal liability, medical payments, and damage to property of others were withdrawn and were not submitted to the jury as a basis for finding liability on the suppression claims. The defendants filed motions for a directed verdict as to the misrepresentation claims and the suppression claims, which the trial court denied. The jury returned its verdict on June 8, 1995, awarding the Parhams $3,500 in compensatory damages and $3,000,000 in punitive damages on their misrepresentation claim and $3,000 in compensatory damages and $4,500,000 in punitive damages on their suppression claim. The jury awarded Massey $3,000 in compensatory damages and $3,000,000 in punitive damages on her misrepresentation claim and $3,000 in compensatory damages and $4,500,000 in punitive damages on her suppression claim. On July 7, 1995, Foremost moved for a judgment notwithstanding the verdict or, in the alternative, for a new trial or a remittitur. On August 22, 1995, the trial court scheduled a hearing on the remittitur issue for October 19, 1995. On September 26, 1995, the parties agreed to extend the time for ruling on the post-judgment motions until November 1, 1995. The trial court conducted a hearing on the remittitur issue on October 19, 1995. On October 26, 1995, the parties agreed to extend the time for ruling on the post-judgment motions until November 14, 1995. On November 14, 1995, the trial court denied Foremost's motion for a judgment notwithstanding the verdict and its motion for a new trial. However, the trial court did not rule on the remittitur motion. Foremost filed its notice of appeal to this Court on December 14, 1995. The trial court purported to enter a remittitur order on March 18, 1996, five months after the October 19, 1995, remittitur hearing and more than four months after it had lost jurisdiction over that post-judgment motion by not ruling on it by November 14, 1995. See Rule 59.1, Ala.R.Civ.P.; Ex parte Johnson Land Co., 561 So.2d 506, 508 (Ala. 1990) ("[i]f the trial court allows a post-trial motion to remain pending, and not ruled upon, for 90 days, then the motion is denied by operation of law and the trial court loses its jurisdiction to further entertain that motion"). The remittitur order purported to reduce the amount awarded to the Parhams to $1,633.50 in compensatory damages and $750,000 in punitive damages on their misrepresentation claim and to $234.80 in compensatory damages and $2,500,000 in punitive damages on their suppression claim. The remittitur order purported to reduce the amount awarded to Massey to $1,200.93 in compensatory damages and $750,000 in punitive damages on her misrepresentation claim and to $228.50 in compensatory damages and $2,500,000 in punitive damages on her suppression claim.[5]
Foremost contends that the trial court erred in not entering a judgment in its favor as a matter of law or, in the alternative, that the trial court erred in not ordering a new trial or at least a further reduction in the verdicts. The following specific issues are presented:
1) Whether Foremost was entitled to a judgment as a matter of law on the ground that the plaintiffs' claims were barred by the applicable statute of limitations;
2) Whether Foremost was entitled to a judgment as a matter of law on the ground that the plaintiffs had failed to present sufficient evidence of each element of their misrepresentation and suppression claims;
3) Whether Foremost was entitled to a judgment as a matter of law on the ground that the plaintiffs had waived their suppression claims;
4) Whether Foremost was entitled to a new trial on the ground that it was not *417 allowed to present evidence indicating that an unqualified juror served on the jury;
5) Whether Foremost was entitled to a new trial on the ground that the trial court committed cumulative errors during the trial 1) by impugning the character of a witness; 2) by improperly allowing certain "pattern and practice" testimony; 3) by allowing the plaintiffs' attorney to ask narrative questions; and 4) by demonstrating open hostility toward Foremost and its attorneys;
6) Whether Foremost was entitled to a new trial on the ground that the jury's finding of liability was against the weight of the evidence; and
7) Whether the compensatory and punitive damages awards, even as remitted, are against the weight of the evidence and, thus, excessive and due to be further reduced.

Directed Verdict and JNOV Issues (Issues 1, 2, and 3)

(1) Statute of Limitations
With respect to the first issue, Foremost contends that the plaintiffs' claims were time-barred. Foremost argues that the Parhams' receipt of their sales documents on July 24, 1989, and Massey's receipt of her sales documents on February 5, 1990, and their receipt shortly thereafter of their insurance policies, all of which indicated that a premium was charged for the first year's coverage under both policies, put the plaintiffs on notice of any misrepresentation on Banks's part and, thus, commenced the running of the statutory limitations period with respect to the misrepresentation claims. Likewise, Foremost argues that the plaintiffs' receipt of their insurance policies shortly after purchasing their mobile homes, which indicated that adjacent structures coverage had been included in the policies, put the plaintiffs on notice that Banks had suppressed material information and, thus, that the running of the limitations period commenced at that time with respect to the suppression claims. According to Foremost, the limitations period on the plaintiffs' claims had expired long before they filed their action on May 13, 1994. The plaintiffs contend that they relied on Banks to accurately convey to them all of the pertinent information concerning their insurance policies. Therefore, according to the plaintiffs, they did not read any of the sales documents or their policies and, consequently, had no actual knowledge of facts that could have put them on notice of any fraud. The plaintiffs claim that they did not learn until early in 1994, after speaking with their attorney, that they might have been defrauded.
Claims of fraudulent misrepresentation and suppression are subject to a two-year statute of limitations. Ala.Code 1975, § 6-2-38(l). Prior to Hickox v. Stover, 551 So.2d 259 (Ala.1989), and Hicks v. Globe Life & Accident Ins. Co., 584 So.2d 458 (Ala.1991), this Court had held that a fraud claim accrued, thus commencing the running of the statutory limitations period, when the plaintiff discovered the fraud or when the plaintiff should have discovered the fraud in the exercise of reasonable care. Parsons Steel, Inc. v. Beasley, 522 So.2d 253 (Ala.1988); Moulder v. Chambers, 390 So.2d 1044 (Ala.1980); Jefferson County Truck Growers Ass'n v. Tanner, 341 So.2d 485 (Ala.1977). The policy considerations underlying that objective standard, which this Court used in determining the statute of limitations issue in fraud cases, was aptly set forth in 51 Am.Jur.2d Limitations of Actions § 17 (1970), as follows:
"The primary purpose of a statute of limitations is to compel the exercise of a right of action within a reasonable time so that the opposing party has a fair opportunity to defend. Statutes of limitation[s] are founded upon the general experience of mankind that claims which are valid are not usually allowed to remain neglected when the right to sue thereon exists. Statutes of limitation[s] are designed to prevent undue delay in bringing suit on claims and to suppress fraudulent and stale claims from being asserted, to the surprise of the parties or their representatives, when all the proper vouchers and evidence are lost, or the facts have become obscure from the lapse of time or the defective memory or death or removal of witnesses. As stated by the Supreme Court of the United States, the purpose of *418 a limitation upon the time within which an action may be commenced is to insure repose and to require that claims be advanced while the evidence to rebut them is still fresh.
"The mischief which statutes of limitation[s] are intended to remedy is the general inconvenience resulting from delay in the assertion of a legal right which it is practicable to assert. Thus, while one of the purposes of the statutes of limitation[s] is to relieve a court system from dealing with `stale' claims, where the facts in dispute occurred so long ago that evidence was either forgotten or manufactured, there is another element of a more substantive character in the protection of the potential defendants from protracted fear of litigation.
"In order to encourage promptness in the bringing of actions, such statutes restrict to fixed, arbitrary periods the time within which rights, otherwise unlimited, may be asserted."
However, in Hicks, a plurality of this Court rejected the long-standing rule that our objective standard of reviewing the statute of limitations issue in fraud cases incorporated the duty to read a document upon its receipt or presentation; and it held that "[t]he question of when a plaintiff should have discovered fraud should be taken away from the jury and decided as a matter of law only in cases where the plaintiff actually knew of facts that would have put a reasonable person on notice of fraud." 584 So.2d at 463. (Emphasis in Hicks.) Hicks was a natural and predictable extension of Hickox, which had been decided less than two years before. In Hickox, this Court, by a vote of five to three, adopted what has become known as the "justifiable reliance standard." The history behind this Court's adoption of this standard, which basically eliminated a person's duty to read and to attempt to understand the contents of a document or documents received in connection with a particular transaction (consumer or commercial), was discussed at length in Johnson v. State Farm Ins. Co., 587 So.2d 974, 977-79 (Ala. 1991):
"Prior to Chief Justice Hornsby's special concurrence in Southern States Ford v. Proctor, 541 So.2d 1081, 1087-92 (Ala. 1989), this Court had permitted a consumer's contributory negligence to defeat that consumer's recovery in a fraud action as a matter of law. This Court had held that if a consumer plaintiff, acting as a reasonably prudent person exercising ordinary care, would have discovered the `true facts' before acting on the alleged misrepresentation, then, as a matter of law, the plaintiff could not have relied on the misrepresentation. Torres v. State Farm Fire & Casualty Co., 438 So.2d 757 (Ala.1983), overruled, Hickox v. Stover, 551 So.2d 259 (Ala. 1989). In doing so, this Court had permitted the reliance element that had been developed in commercial transactions (Bedwell Lumber Co. v. T & T Corp., 386 So.2d 413 (Ala.1980)) to tread `into the arena of consumer transactions.' Southern States Ford, 541 So.2d at 1090. Chief Justice Hornsby, in his special concurrence in Southern States Ford, wrote that Bedwell Lumber Co. was not incorrectly decided; and two of the five Justices who concurred in Bedwell Lumber Co., including its author, joined the Chief Justice's special concurrence in Southern States Ford.

"Chief Justice Hornsby proposed the following as the test for the reliance element in an action alleging consumer fraud:
"`A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully understand the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representation if that representation is "one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth."'
"541 So.2d at 1091-92.
"Chief Justice Hornsby's special concurrence in Southern States Ford did not purport to have this new `justifiable reliance' standard apply to commercial transactions. The `reliance' element in fraud actions based on commercial transactions remained as it had been since Bedwell Lumber, 386 So.2d at 415:

*419 "`[T]he representee's reliance must be reasonable under the circumstances; and, where a party has reason to doubt the truth of the representation or is informed of the truth before he acts, he has no right to act thereon.... We reaffirm the principle of the law of fraud that knowledge of such facts which ought to excite inquiry and which, if pursued, would lead to knowledge of other facts, operates as notice of these other facts.'

"Hickox v. Stover, supra, involved a commercial insurance scenario. The alleged fraudulent misrepresentation was: `[T]he [insurance] coverage we are offering... is equal to the coverage provided by your existing [insurance] carrier....' 551 So.2d at 261. The existing policy had an endorsement that negated the effect of a co-insurance provision (`amount of [insurance coverage in policy] represents 90% of the value of the property covered'). The replacement policy had the same co-insurance provision, but no endorsement negating that provision. The policy was sent to the insured and the insured was informed by separate letter to check its `equipment values' because the values stated in the new policy were the same as those stated for the last three years. The letter read, `The [new] policy has a 90% coinsurance provision which means the values are to be 90% of replacement. Please have someone check these values so that there will not be a problem if there is a loss.'
"551 So.2d at 262.
"There was a loss and there was a problem. Five Justices on this Court held that the plaintiff's reliance on the representation (`the coverage we are offering ... is equal to the coverage provided by your existing carrier') was not unjustified as a matter of law. The alleged misrepresentation was not so patently and obviously false that the plaintiff must have closed his eyes to avoid the discovery of the truth.
"If the Bedwell Lumber standard had been used, defendant Stover would have been entitled to a summary judgment as a matter of law, because plaintiff Hickox was notified in writing, not only by the policy, but by the separate letter, that if the values, which had been stated three years earlier, were not 90% of the replacement cost, then there would be a problem if there was a loss. Clearly, Hickox had knowledge of facts that ought to have excited inquiry (i.e., knowledge that if the insured value was not 90% of the replacement cost, he would have a problem if he had a loss). Bedwell Lumber.

"Therefore, the standard that was proposed as a standard for reliance in consumer transactions only, was first applied in a per curiam opinion involving a commercial transaction only. Since Hickox v. Stover, supra, the reliance standard recommended only for consumer transactions has been applied in both consumer and commercial transactions: Grimes v. Liberty National Life Insurance Co., 551 So.2d 329 (Ala.1989) (consumer transaction, summary judgment for defendant affirmed); AT & T Information Systems, Inc. v. Cobb Pontiac-Cadillac, Inc., 553 So.2d 529, 532 (Ala.1989) (commercial transaction, judgment based on jury verdict for plaintiff affirmed, with four Justices stating `[w]hether reliance is justifiable in a given fraud action is a question of fact' and that `[c]onsequently, where there is a scintilla of evidence [substantial evidence after June 11, 1987, see § 12-21-12, Ala.Code 1975] that the reliance was justifiable, JNOV is improper'); ALFA Mutual Insurance Co. v. Brewton, 554 So.2d 953 (Ala.1989) (consumer transaction, judgment based on jury verdict for plaintiff affirmed); McDowell v. Key, 557 So.2d 1243 (Ala.1990) (consumer transaction, judgment based on jury verdict for plaintiffs affirmed, with Court noting that Cahaba Valley Development Corp. v. Nuding, 512 So.2d 46 (Ala.1987), in which this Court used the `reasonable reliance' test in Bedwell Lumber and affirmed a judgment for the plaintiff, had weaker facts than McDowell v. Key, supra); Ramsay Health Care, Inc. v. Follmer, 560 So.2d 746 (Ala.1990) (commercial transaction, judgment based on jury verdict for plaintiff affirmed); Land & Associates, Inc. v. Simmons, 562 So.2d 140 (Ala.1989), cert. denied, General American Life Ins. Co. v. *420 Simmons, [499 U.S. 918] 111 S.Ct. 1305, 113 L.Ed.2d 240 (1991) (consumer transaction, judgment based on remitted jury verdict for plaintiff affirmed); E & S Facilities, Inc. v. Precision Chipper Corp., 565 So.2d 54 (Ala.1990) (commercial transaction, judgment based on jury verdict for plaintiff affirmed); Griggs v. Finley, 565 So.2d 154 (Ala.1990) (consumer transaction, judgment based on jury verdict for plaintiff affirmed); Withers v. Mobile Gas Service Corp., 567 So.2d 253 (Ala.1990) (commercial transaction (condemnation of right of way), summary judgment for defendant in fraud action affirmed); McConico v. Corley, Moncus & Bynum, P.C., 567 So.2d 863 (Ala.1990) (consumer transaction, summary judgment for defendant affirmed); Rodopoulos v. Sam Piki Enterprises, Inc., 570 So.2d 661 (Ala.1990) (commercial transaction, judgment based on jury verdict for plaintiff affirmed); Standard Furniture Manufacturing Co. v. Reed, 572 So.2d 389 (Ala.1990) (commercial transactionemployee-employer representation concerning value of employee's pension plan; judgment based on jury verdict for plaintiff affirmed); Dixon v. SouthTrust Bank of Dothan, N.A., 574 So.2d 706 (Ala.1990) (commercial transaction, summary judgment for defendant reversed). Harris v. M & S Toyota, Inc., 575 So.2d 74 (Ala.1991), involved a consumer transaction. The jury returned a verdict for the plaintiffs and a new trial was granted to the defendant, but not on the reliance issue. A majority of this Court held:
"`This Court has abandoned the requirement of "reasonable reliance," whereby a party making a false statement prevailed whenever the person defrauded did not investigate the statement in order to discover fraud.
"`The present standard of "justifiable reliance" requires ... [t]he party receiving the representation ... to be alert to statements that are patently false.'
"575 So.2d at 77.

"Curtis v. Bill Byrd Automotive, Inc., 579 So.2d 590 (Ala.1990), involved a consumer transaction in which a summary judgment for the defendant was reversed; Commercial Credit Corp. v. Lisenby, 579 So.2d 1291 (Ala.1991), involved a consumer transaction in which a judgment for the plaintiffs was reversed and a judgment rendered in favor of the defendant; and Hicks v. Globe Life & Accident Insurance Co., 584 So.2d 458 (Ala.1991), involved a consumer transaction in which a summary judgment for the defendant was reversed and the cause remanded.
"....
"For the edification of the bench and bar, we reiterate that the `justifiable reliance' standard, first proposed as a standard for consumer fraud transactions in Chief Justice Hornsby's special concurrence in Southern States Ford and adopted by five members of this Court as the standard in commercial fraud transactions in Hickox v. Stover, is the standard by which to test the `reliance' element in both consumer and commercial fraud transactions:
"`A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully understand the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representation if that representation is `one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth.'
"541 So.2d at 1091-92."
There has been a tension among the Justices on this Court ever since the 140-year-old standard for determining the reliance issue in fraud cases was changed in Hickox. See, e.g., Hickox (Maddox, Houston, and Kennedy, JJ., concurring in part and dissenting in part, 551 So.2d at 266-68); Hicks (Shores, J., concurring in the result, 584 So.2d at 465) (Maddox, Houston, and Steagall, JJ., concurring in part and dissenting in part, 584 So.2d at 465-69) (Almon, J., dissenting, 584 So.2d at 469-70); Johnson (Shores, J., concurring specially, McKelvy v. Darnell, 587 So.2d 980). In fact, the present senior Justices on this Court have both called for a return to the law of fraud as it existed before Hickox, See Burroughs v. Jackson National Life Ins. Co., 618 So.2d 1329, 1333 (Ala.1993) (Maddox, J., concurring specially); *421 Cleveland Auto Sales, Inc. v. Kelly, 620 So.2d 622, 623 (Ala.1993) (Maddox, J., concurring specially); McCullough v. McCnalley, 590 So.2d 229, 235 (Ala.1991) (Almon, J., joined by Maddox, J., concurring in part and dissenting in part). The concerns that have been expressed by at least four present members of this Court as to the impact the Hickox standard has had on the law of fraud were best expressed by Justice Almon in his dissent in Hicks:
"The traditional standard of `reasonable reliance' provided a flexible concept adaptable to the circumstances of each case, including the relative sophistication and bargaining powers of the parties. The new standard of `justifiable reliance' gives to parties claiming fraud undue leeway to ignore written contract terms and allows in some cases the automatic creation of a jury issue by a plaintiff's statement in contradiction of such written terms."
584 So.2d at 469-70.
After careful consideration, we conclude that the "justifiable reliance" standard adopted in Hickox, which eliminated the general duty on the part of a person to read the documents received in connection with a particular transaction (consumer or commercial), should be replaced with the "reasonable reliance" standard most closely associated with Torres v. State Farm Fire & Casualty Co., 438 So.2d 757 (Ala.1983). The "reasonable reliance" standard is, in our view, a more practicable standard that will allow the factfinder greater flexibility in determining the issue of reliance based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties. In addition, a return to the "reasonable reliance" standard will once again provide a mechanism, which was available before Hickox, whereby the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms. This Court in Hickox deviated from this State's public policy that had been expressed in our caselaw as early as 1849, see Munroe v. Pritchett, 16 Ala. 785 (1849), and that had been codified by the legislature in 1907. See Ala.Code 1975, § 6-5-101; Harton v. Belcher, 195 Ala. 186, 70 So. 141 (1915). We now conclude that that deviation was a mistake. Although this Court strongly believes in the doctrine of stare decisis and makes every reasonable attempt to maintain the stability of the law, this Court has had to recognize on occasion that it is necessary and prudent to admit prior mistakes and to take the steps necessary to ensure that we foster a system of justice that is manageable and that is fair to all concerned. See, e.g., Jackson v. City of Florence, 294 Ala. 592, 598, 320 So.2d 68, 73 (1975), in which Justice Shores, writing for this Court, stated: "As strongly as we believe in the stability of the law, we also recognize that there is merit, if not honor, in admitting prior mistakes and correcting them."
For the foregoing reasons, we overrule Hickox, to the extent that it changed the law of fraud as it had existed prior thereto. Furthermore, we overrule Hicks, to the extent that it changed the standard that had previously existed for determining the statute of limitations issue in fraud cases. Because this return to the reasonable reliance standard represents a fundamental change in the law of fraud, we think it appropriate to make the new standard applicable in all fraud cases filed after the date of this decision, i.e., all cases filed after March 14, 1997.
The Parhams purchased their mobile home while the "reasonable reliance" standard, to which we return today, was the law in Alabama. Both the Parhams and Massey purchased their mobile homes while the statute of limitations standard in fraud cases to which we return today, was the law in Alabama. The record shows that the present action was filed almost 4 years and 10 months after the Parhams had purchased their mobile home and over 4 years and 3 months after Massey had purchased her mobile home. As Foremost correctly points out, the plaintiffs received documents when they purchased their mobile homes (most of which they signed) or shortly thereafter that *422 if read or even briefly skimmed would have put reasonable persons on notice that, contrary to Banks's representation, they had paid for their first year's coverage and that they had also purchased adjacent structures coverage. As previously noted, Patricia Parham had completed high school. At the time of the trial, she was a corrections officer with the Bullock County Correctional System and a student at Troy State University in Montgomery, studying to be a registered nurse. Mary Massey had completed the 10th grade and part of the 11th grade and later had earned her GED or high school equivalency certificate. At the time of the trial, she had been employed for 15 years as a materials handler at Cooper Lighting Company. Reading is one of her hobbies. Both Ms. Parham and Ms. Massey testified that had they read their sales documents and their insurance policies they would have learned that they had paid for their first year's coverage and that their policies included adjacent structures coverage. If we were to apply the objective standard for determining the statute of limitations issue in fraud cases that existed before Hicks, and that has been readopted today, we would hold that the plaintiffs should have discovered Banks's misrepresentation concerning the first year's premiums when they signed and received their sales documents. Because they each received their sales documents more than two years before filing this action, their misrepresentation claims would be barred by the two-year statute of limitations. Likewise, we would hold that the plaintiffs should have discovered when they received their insurance policies that Banks had not told them about the adjacent structures coverage. Because they each received their insurance policies more than two years before filing this action, their suppression claims would be barred by the two-year statute of limitations. However, under the majority's holding in Hicks, which is applicable in this case, the plaintiffs' receipt of the documents and their failure to read them did not entitle Foremost to a judgment as a matter of law on the ground that the statutory limitations period had expired. A jury question was presented as to whether the plaintiffs were justified in relying on what Banks had or had not told them. The trial court submitted this issue to the jury, and the jury obviously found that the plaintiffs had not acted unreasonably in relying on Banks's representations as to the cost of the first year's coverage and on his silence as to the inclusion of adjacent structures coverage. Because the evidence indicates that it was not until the early part of 1994 that the plaintiffs actually learned from their attorney that they had paid for their first year's coverage and that they had purchased adjacent structures coverage, the trial court properly declined to hold that as a matter of law the claims were barred by the statute of limitations, based upon the majority's holding in Hicks.

(2) Sufficiency of the Evidence
With respect to the second issue, Foremost contends that it was entitled to a judgment as a matter of law on the ground that the plaintiffs failed to present sufficient evidence to submit their misrepresentation and suppression claims to the jury. The plaintiffs counter with the argument that the evidence was more than sufficient to allow the jury to decide whether they were the victims of misrepresentation and suppression.

(2)(a) Misrepresentation
The elements of a misrepresentation claim are 1) a misrepresentation of material fact, 2) made willfully to deceive, recklessly, without knowledge, or mistakenly, 3) which was justifiably relied on by the plaintiff under the circumstances, and 4) which caused damage as a proximate consequence. Ala.Code 1975, § 6-5-101; Harrington v. Johnson-Rast & Hays Co., 577 So.2d 437 (Ala.1991). In Chapter 7 of the Alabama Insurance Code ("Property, Casualty and Surety Insurance Representatives"), "agent" is defined in pertinent part in § 27-7-1 as "[a] natural person, partnership or corporation appointed by an insurer to solicit and negotiate insurance contracts on its behalf." The trial court instructed the jury as follows:
"An agent is a person who by agreement with another, called the principal, acts for the principal and is subject to his control. The agreement may be oral or written or implied from the conduct of the parties and may be with or without compensation. *423 Now, when an agent is engaged to perform a certain service, whatever he does to that end or in the furtherance of the employment is deemed to be an act done within the scope of his employment."
The jury could have reasonably found from the evidence in the present case that Foremost, through its district manager, Carmichael, was aware that C & C, through its sales representative, Banks, was acting as an unlicensed agent on Foremost's behalf when it solicited applications from the plaintiffs for Foremost insurance policies. The evidence also indicates, and the jury could have reasonably found, that Foremost was aware that Banks had not been properly trained and licensed; that Banks told the plaintiffs that they would not have to pay a premium for their first year's coverage; that that representation was false; and that the representation was motivated by the desire to sell policies and earn commissions. Furthermore, although Foremost argues strenuously that the plaintiffs could not have justifiably relied on Banks's misrepresentation to their detriment, there was evidence to the contrary. The plaintiffs testified that they relied on Banks's statement that they would incur no premium for their first year's coverage and, therefore, that they did not read the documents that they received in connection with their purchase of the mobile homes. Although Foremost ably argues that as a matter of law the plaintiffs could not have justifiably relied on Banks's statement, given the fact that the plaintiffs had in their hands certain documents (many of which they had signed) clearly showing that a premium had been charged, a jury question was nonetheless presented under the majority's holding in Hickox, supra, as to whether the plaintiffs, under the circumstances, justifiably relied on Banks's explanation concerning the first year's premium. Finally, the evidence shows that the plaintiffs incurred premium charges for their first year's coverage and that the premiums were included in the total amount financed. The plaintiffs testified that if they had known that a premium was going to be charged for their first year's coverage, they would have elected to pay cash for the coverage instead of incurring interest charges by having the premium included in the total amount financed. The evidence was sufficient for the jury to find that an intentional fraud was committed on the plaintiffs by a Foremost agent on Foremost's behalf. Based on the foregoing, we conclude that the plaintiffs' misrepresentation claims, seeking both compensatory and punitive damages, see Ala.Code 1975, § 6-11-27(a), were properly submitted to the jury.

(2)(b) Suppression
The elements of a suppression claim are 1) a duty to disclose the facts, 2) concealment or nondisclosure of material facts by the defendant, 3) inducement of the plaintiff to act, and 4) action by the plaintiff to his injury. Wilson v. Brown, 496 So.2d 756 (Ala.1986). Silence is not fraud unless an obligation to communicate a material fact exists. Such an obligation may arise where a confidential relation or "particular circumstances" exist. Ala.Code 1975, § 6-5-102; Trio Broadcasters v. Ward, 495 So.2d 621 (Ala.1986). Under § 6-5-102, the particular circumstances that impose upon a party a duty to speak may arise from the relationship of the parties; the relative knowledge of the parties; the value of the particular fact; and other factors. Lowder Realty, Inc. v. Odom, 495 So.2d 23 (Ala.1986).
As previously noted, the plaintiffs presented evidence indicating that Foremost allocated a specific premium to the adjacent structures coverage provided under its mobile home homeowner's policies and that that coverage, upon request, could have been dropped, with a corresponding reduction in the premium. Although the record contains no evidence that the plaintiffs and Banks had a confidential or fiduciary relationship that would have created a duty on Banks's part to disclose this information, or that the plaintiffs informed Banks that they had no adjacent structures and asked if this coverage could be deleted, the evidence does indicate that none of the plaintiffs, either personally or through the operation of a business, had any meaningful experience in buying property insurance or that they otherwise had any knowledge of the insurance industry that could have put them on notice that they did not have to purchase adjacent structures coverage *424 if they did not want or have any need for it. The plaintiffs, as ordinary consumers, had no way of knowing at the time they purchased their mobile homes and their mobile home homeowner's insurance that they could request that adjacent structures coverage not be included in their Foremost policies. Furthermore, as previously noted, a fact question was presented as to whether the plaintiffs acted reasonably in not reading their policies upon receiving them, even though those policies would have disclosed that adjacent structures coverage was included. In this respect, we note that the acts of suppression occurred at the time the plaintiffs purchased their mobile homes and submitted their applications for mobile home homeowner's insurance, not at the time they received their policies. See Hicks, at 462. The evidence also indicates that knowledge of the optional nature of the adjacent structures coverage under the Foremost policy would have been of value to the plaintiffs. Although Foremost presented compelling evidence that the policy was marketed as a "package" for the benefit of all of its customers, even those without adjacent structures at the time of the purchase, the plaintiffs testified that had they known that the adjacent structures coverage could be dropped, they would not have purchased it and incurred the additional expense. This Court has stated that "[w]here the defendant had superior knowledge of the suppressed fact and the defrauded party has been induced to take action that otherwise might not have been taken, the obligation to disclose is particularly compelling." Baker v. Bennett, 603 So.2d 928, 935 (Ala.1992). With respect to the specific duty of an insurance company, we note that Carmichael testified as follows:
"Q. It is also correct that an insurance company should fully disclose all important facts related to an insurance policy [to] the policyholder?
"A. They should.
"Q. An insurance company should always tell the truth to the policyholder?
"A. They should."
Based on the evidence presented, we conclude that there was sufficient evidence of each of the elements of the plaintiffs' suppression claim (duty to disclose a material fact; nondisclosure of that fact; inducement of the plaintiffs to act; and damage) to submit those claims to the jury. See Lowder Realty, Inc. v. Odom, supra; Berkel & Co. Contractors, Inc. v. Providence Hospital, 454 So.2d 496 (Ala.1984). We emphasize, however, that by this holding we do not decide whether an insurer marketing a package policy with no optional coverages (coverages that could, upon request by the customer, be dropped with a corresponding reduction in the premium) is under a duty to inquire of the customer as to whether he or she wants or has a need for a specific coverage included in the policy and to disclose the existence of that coverage under the policy. We hold only that a duty does arise on the part of an insurer to disclose the existence of a specific coverage under the policy when, as shown by the evidence in this case, the insurer has specific knowledge that a significant number of customers may not want or have a need for the coverage and that the coverage could be dropped with a corresponding savings in premium to the customer. Under these circumstances, the customer should be informed that the coverage may not be desired or necessary for everyone and the customer should be allowed to make an informed decision as to whether to purchase the coverage.

(3) Waiver
Relying primarily on Musselman v. Colonial Bank of North Alabama, 554 So.2d 973 (Ala.1989), Foremost contends that the plaintiffs had waived their suppression claims as a matter of law. The record indicates that the plaintiffs renewed their mobile home homeowner's policies and retained their coverage for adjacent structures after they had learned the facts that later formed the basis for their suppression claims. In this respect, the record indicates that the plaintiffs first learned of a suppression in connection with their adjacent structures coverage in February 1994, when their attorney brought the matter to their attention; that they filed this action on May 13, 1994, naming, among others, several fictitiously named defendants, but without naming Foremost as a defendant; that the Parhams renewed their policy *425 containing adjacent structures coverage in July 1994; that the plaintiffs amended their complaint on October 13, 1994, to state a claim of misrepresentation (free insurance) against Foremost; that Massey renewed her policy containing adjacent structures coverage in December 1994; that the plaintiffs amended their complaint on February 13, 1995, to state a claim of suppression against Foremost, based on allegations that Foremost had not disclosed to the Parhams the existence or the cost of the adjacent structures coverage; and that the plaintiffs amended their complaint on February 17, 1995, to state a claim of suppression against Foremost, based on allegations that Foremost had not disclosed to Massey the existence or the cost of the adjacent structures coverage. The plaintiffs testified that they left the decision to renew their policies up to their attorney. The record does not indicate exactly why the plaintiffs' attorney elected to renew the policies.
According to Foremost, the plaintiffs could not, as a matter of law, simultaneously retain their adjacent structures coverage and sue for damages for suppression of the fact that they were sold such coverage when they purchased their mobile homes. In Musselman, this Court, citing Holczstein v. Bessemer Trust & Savings Bank, 223 Ala. 271, 136 So. 409 (1931), noted that when a party, after renewing a promissory note, alleges fraud in the execution of the note, the renewal of the note with knowledge of the fraud could constitute a waiver of fraud as a defense to the enforcement of a note. Musselman involved various claims for damages, including claims based on allegations of fraud, surrounding the execution of the note. Although this Court indicated in Musselman that the rule stated in Holczstein could, under certain circumstances, be applicable so as to cause the waiver of damages claims as a matter of law, the summary judgment for the defendant bank was reversed because of the conflicting nature of the testimony. Musselman, in our view, is distinguishable from the present case in one important respect. In Musselman, the plaintiffs renewed the note in question before they filed their complaint. Had there not been other conflicts in the evidence that required resolution by a jury, the fact that the plaintiffs renewed the note before they filed their action might have constituted a waiver of their fraud claims. However, in the present case, the plaintiffs filed their complaint before they (or, as the record indicates, their attorney) made the decision to renew their policies. The plaintiffs did nothing before filing their complaint that would indicate an intention on their part to relinquish their fraud claims. Whatever reason the plaintiffs' attorney may have had for waiting until February 1995 to add the suppression claim against Foremost, or whatever reason the plaintiffs' attorney may have had after filing the complaint for renewing the Foremost policies and retaining adjacent structures coverage for the plaintiffs, we cannot hold, as a matter of law, based on the facts before us, that the plaintiffs intended to waive their fraud claims or that their attorney intended to do so on their behalf. The burden of proving an affirmative defense is on the defendant. Lightfoot v. Floyd, 667 So.2d 56 (Ala.1995); Pegram v. Hebding, 667 So.2d 696 (Ala.1995); J. Colquitt, Alabama Law of Evidence, § 12.1 (1990). In Alabama, a waiver requires the intentional relinquishment of a known right, and that intentional relinquishment must be shown in an unequivocal manner. Putman Constr. & Realty Co. v. Byrd, 632 So.2d 961 (Ala.1992). We conclude that Foremost did not establish the existence of that defense as a matter of law. Waiver is normally an issue for the jury, Putman, supra; Braswell Wood Co. v. Fussell, 474 So.2d 67 (Ala.1985); and the jury was instructed on that defense.

New Trial Issues (Issues 4, 5, and 6)
Citing Chrysler Credit Corp. v. McKinney, 456 So.2d 1069 (Ala.1984), Foremost contends that the trial court erred in not ordering a new trial on the ground that one of the jurors was not qualified under Ala.Code 1975, § 12-16-60, to serve on the jury. Section 12-16-60 provides, in pertinent part, as follows:
"(a) A prospective juror is qualified to serve on a jury if the juror is generally reputed to be honest and intelligent and is esteemed in the community for integrity, *426 good character and sound judgment and also:
"....
"(3) Is capable by reason of physical and mental ability to render satisfactory jury service, and is not afflicted with any permanent disease or physical weakness whereby the juror is unfit to discharge the duties of a juror...."
The record indicates that Foremost learned through a post-trial interview that one of the jurors suffered from diabetes and a hearing problem. That interview, which was conducted by a paralegal employed by Foremost's attorney, was recorded on audiotape. Foremost argued in support of its new trial motion that the juror's diabetic condition worsened while the trial was in progress and that, as a result, she was not capable of rendering satisfactory jury service. The trial court conducted a hearing on the matter and questioned the juror as to whether she had understood and fully participated in the trial proceedings and jury deliberations. The juror responded that she had. As part of its cross-examination of the juror, Foremost's attorney sought to use the tape to "refresh her recollection and/or impeach [her] testimony." The trial court refused to allow Foremost to question the juror about the tape and refused to admit into evidence either the tape or the juror's medical records, which, according to Foremost, confirmed the "long-standing and severe nature of her diabetic problems." Foremost maintains that the trial court erred in restricting its examination of the juror. The plaintiffs contend that it was within the trial court's discretion to question the juror and to limit questions by Foremost's attorney, who, according to the plaintiffs, was merely attempting to impermissibly impeach the jury's verdict.
Without deciding whether the trial court overstepped its bounds in restricting Foremost's examination of the juror, we hold that Foremost waived its right to mount a post-trial challenge to the juror's qualifications under § 12-16-60. The record indicates that the trial court asked the following question during voir dire: "Are there any of you that are incapable by reason of physical or mental ability to render satisfactory jury service?" This was the only question that the trial court asked that even came close to inquiring as to a prospective juror's medical condition. The challenged juror did not respond to this question, and the record does not indicate that the question called for a response on her part. Foremost's primary contention is that the juror's diabetic condition worsened after voir dire, while the trial was in progress. The record also fails to reveal any questions on the part of Foremost's attorney during voir dire pertaining to any of the prospective jurors' medical conditions and to the effect that those medical conditions might have on their jury service. In Holland v. Brandenberg, 627 So.2d 867 (Ala.1993), this Court considered the criteria for jury qualification found at § 12-16-60. The qualifying factor at issue in Holland is found at § 12-16-60(a)(4) (the prospective juror has "lost the right to vote by a conviction for any offense involving moral turpitude"). In Holland, the prospective jurors were not specifically asked whether any of them had been convicted of an offense involving moral turpitude, yet this potentially disqualifying factor was raised in a motion for new trial. This Court held that "[f]ailure to use due diligence in testing jurors as to qualifications or grounds of challenge is an effective waiver of grounds of challenge; a defendant cannot sit back and invite error based on a juror's disqualification." 627 So.2d at 870. As in Holland, nothing in the record in the present case indicates that the complaining party's attorney followed up on the trial court's general inquiry as to whether any of the prospective jurors were physically unable to serve. There is no indication that Foremost's attorney asked the prospective jurors whether any of them suffered from any kind of chronic medical condition that might from time to time worsen and, thus, have an adverse effect on their ability to serve as jurors. Foremost was not entitled to a new trial on this ground. See, also, McBride v. Sheppard, 624 So.2d 1069 (Ala.1993); General Motors Corp. v. Hopper, 681 So.2d 1373 (Ala.1996).
Foremost also contends that it should have been granted a new trial on the grounds that the trial court committed several *427 errors during the trial that either individually or cumulatively prejudiced it in the eyes of the jury. Foremost first argues that the trial court improperly commented on the credibility of one of the witnesses, Robert Banks, the sales representative for C & C who sold the insurance policies to the plaintiffs. Banks, who was called as a hostile witness by the plaintiffs, testified that he did not tell the plaintiffs that they would incur no charge for their first year's coverage. According to Foremost, the credibility of Banks's testimony was called into question during the following colloquy between the parties' attorneys and the trial court:
"Q. Please state your name.
"A. Robert Banks.
"Q. Mr. Banks, we had called and asked you to come to trial, and actually issued a subpoena for you that was left last Friday and you refused to come; is that correct?
"A. No, sir.
"Q. Your wife didn't tell you that we called several times, and we called your place of business?
"A. Sir, you called yesterday afternoon about 3:00, somebody did, and she informed them she saw me late last night. There was no subpoena left anywhere.
"Q. Well, I won't argue with you on that. You were actually required to come here by the sheriff weren't you?
"A. Sir?
"[Foremost's attorney]: Object to the form, Your Honor. He said `by the sheriff.' I assume this was done for a trial witness like anybody else.
"[Plaintiffs' attorney]: No, sir, I think you know better than that. He was issued by the court to come.
(Thereupon, attorneys and the court all began speaking at the same time in conversation not intelligible to be reported.)
"[Plaintiffs' attorney]: Look, I'm not going to argue with you. Y'all talk to the judge.
"THE COURT: I issued a bench warrant for him to be brought to court today because he failed to obey a subpoena."
The plaintiffs argue that the trial court's comment was not directed toward the evidence and that even if that comment could be construed as an indirect comment on Banks's credibility, it was not so prejudicial as to require a new trial.
It is improper for a trial court to comment on the weight and effect of the evidence or on the credibility of a witness. Macon County Comm'n v. Sanders, 555 So.2d 1054 (Ala.1990). After reviewing the record, we conclude that no reversible error occurred. As we understand Foremost's argument, the prejudice supposedly occurred when the trial judge stated that he had issued the bench warrant "because he [Banks] failed to obey a subpoena." According to Foremost, the trial court should not have made this comment without conducting a further inquiry to determine the exact circumstances surrounding the issuance of the subpoena. Although it might have been prudent for the trial court to do as Foremost has suggested, the record does not indicate that Foremost objected to the comment, asked for a curative instruction, or moved for a mistrial. Without Foremost's at least calling this comment to the trial court's attention and without its seeking a clarification from the witness as to whether he had failed to obey the subpoena, we can conclude only that Foremost waived any error that may have resulted from the trial court's comment.
Foremost next argues that the trial court erred to reversal in admitting the testimony of Lewis Tunstall, Rachael Morgan, and Aaron Grubbs as evidence of a pattern or practice of fraud on Foremost's part. Although it acknowledges that evidence of similar fraudulent acts is admissible to prove an alleged fraudulent scheme, according to Foremost the testimony of these witnesses was not admissible because their experiences were not substantially similar to the events that formed the basis of this action. See Ex parte Georgia Casualty & Surety Co., 531 So.2d 838, 841 (Ala.1988) (evidence of other fraudulent transactions by the same party and substantially of the same character, contemporaneous in point of time, or nearly so, is admissible to show fraud in respect to a matter wholly distinct from the previous *428 transaction). The plaintiffs contend that no error resulted in the admission of Tunstall's testimony because, according to the plaintiffs, the trial court later instructed the jury to disregard his testimony. The plaintiffs argue that the testimony of Morgan and Grubbs, even if found to be irrelevant and, thus, inadmissible, could not have so prejudiced Foremost as to require a new trial.
The record indicates that the trial court initially overruled Foremost's objection to Tunstall's testimony, but later reversed its decision:
"Ladies and gentlemen, there is something I need to tell you this morning. I know that y'all remember at the first of this case I told you one of my jobs was to rule on objections, and the purpose of that was to make sure only legal, admissible evidence comes before you which you are to decide the case.
"I made a mistake. I have let some evidence come in that shouldn't have come in. Now, that was the testimony of Mr. Lewis Tunstall. Y'all remember Mr. Tunstall, who was the elderly gentleman that sat here that was from Greene County that had the trailer. I'm going to tell you I should not have let him testify. So, I'm telling you now to exclude from your mind and from your consideration in this case all of the testimony that that gentleman gave. And, I'm going to tell you why, and how I made a mistake, and why I'm doing this.
"When they were taking his deposition, and y'all know by now what a deposition is, where they swear a witness before a court reporter and ask him questions, one of the lawyers in [the plaintiffs' attorney's office],..., who is a fine young man, and a fine lawyer, and in my opinion would not do anything he didn't think was right under any circumstances, but he was going to be a young lawyer, but he is young. And, young lawyers don't always know, and they make mistakes. I'm an old lawyer, and an old judge, and I make mistakes. But, what happened was during the deposition, during the questioning of Mr. Tunstall by [Foremost's attorney], did you do the questioning?
"[Foremost's attorney]: Yes, sir.
"The Court: Who was doing it? Well, anyway, one of the lawyers for the defendant was questioning Mr. Tunstall, and [one of the plaintiffs' attorneys] stopped him during the middle of the testimony and took him outside. Now, I don't have any idea that he said anything that was improper, but that is not the right thing to do, and it can't be done. It is just like if somebody was being questioned on the stand and the lawyer didn't like what the question was that was asked and stopped him and said, `I want to take him out.' Well, you can't do that.
"I had thought at the time when I made the ruling that he had taken him outside after they had finished questioning him. So, that is why I made the ruling, and that is how I made a mistake. I wasn't informed, and, of course, it is my thought, and I'm not putting the blame on everybody else, but, you know how objections are, and how the little boy hollered wolf. When you holler wolf all the time you ain't worried about the wolf, really, you know. But, I let the wolf out, so I'm correcting it at this point and telling y'all to disregard any and all the testimony that Mr. Tunstall gave in your decision of this case."
According to the plaintiffs, the trial court's instruction to the jury cured any prejudice that may have resulted from the admission of Tunstall's testimony. Foremost argues that Tunstall's testimony was so prejudicial that no instruction by the trial court could have cured it. After reviewing the record, we do not believe that the admission and subsequent exclusion of Tunstall's testimony requires reversal. Tunstall testified that he had purchased a mobile home in January 1991 from a dealer in Greene County who had also sold him a Foremost homeowner's insurance policy. Tunstall further testified that that dealer had misrepresented to him that he would incur no charge for the first year's premium. Although this testimony was relevant to show a pattern or practice of fraud on the part of mobile home dealers representing Foremost in Alabama, the trial court excluded it, based on the conduct of one of the plaintiffs' attorneys during a deposition. The trial court fully explained to the *429 jury why it was excluding Tunstall's testimony, and it specifically instructed the jury not to consider it for any purpose. Foremost has cited no cases indicating that the trial court's instruction was insufficient as a matter of law, and we are not persuaded that the initial admission of Tunstall's testimony constituted reversible error.
Likewise, we find no basis for reversal because of the admission of the testimony of Morgan and Grubbs. Morgan testified, over objection, that she had purchased a mobile home in 1988 from a dealer in Tuscaloosa and that that dealer had sold her a Foremost mobile home homeowner's insurance policy. She further testified that that dealer misrepresented to her that she would incur no charge for her first year's coverage and that she was not told anything about having adjacent structures coverage. Foremost was allowed to fully cross-examine Morgan, and, although she expressed uncertainty as to the circumstances surrounding the purchase of her mobile home, she was adamant in her belief that she had been sold a Foremost insurance policy in 1988. Foremost introduced evidence (a copy of a declarations page from an insurance policy) indicating that the insurance policy issued to Morgan in 1988 was, in fact, a three-year policy issued by American Security Insurance Companynot by Foremostfor a premium of $619. This documentary evidence, as well as the testimony of Peggy Ferrell, a manager in Foremost's customer relations department, indicated that Foremost did not insure Morgan until 1991, when it issued her a policy that, according to Ferrell, replaced the one previously issued by American Security. In rebuttal, the plaintiffs introduced a copy of an "Installment Note Security Agreement and Disclosure Statement" prepared in connection with Morgan's purchase of her mobile home. On that document, a $619 premium is shown as having been paid to "insurance companies." Directly beneath that provision, the following appears: "$.00 to Foremost Insurance Company for 00 month extended warranty contract." We are uncertain as to what this means; however, it appears the plaintiffs introduced the document in an attempt to show that Foremost was somehow involved in the purchase of Morgan's mobile home. Based on our review of the record, we agree with the trial court that Morgan's credibility was a question for the jury and that it would be inappropriate to rule that as a matter of law the admission of her testimony constituted reversible error. As previously noted, in fraud cases, where intent, knowledge, and scienter constitute essential elements of the offense, evidence of similar frauds and misrepresentations is admissible. In passing upon the admissibility of such collateral matters, great latitude must be extended so as to allow the admission of any relevant evidence bearing upon the ultimate issue of fraud. In this respect, questions of relevancy rest largely within the discretion of the trial court. Its ruling concerning the relevancy of pattern and practice evidence should not be disturbed on appeal unless the court's discretion has been abused. Dorcal, Inc. v. Xerox Corp., 398 So.2d 665 (Ala.1981). We cannot hold, based on the record before us, that the trial court abused its discretion.
Grubbs testified that he had a Foremost mobile home homeowner's policy with adjacent structures coverage and that he had inquired of Foremost whether his policy covered a damaged fence on his property. Grubbs testified, over objection, that a Foremost representative told him that his fence was not covered as an "adjacent structure" under his policy. Foremost presented evidence indicating that it had no record of Grubbs having filed such a claim. We agree with Foremost that Grubbs's testimony should have been excluded on relevancy grounds. The experience of this witness was not substantially similar to the experience made the basis of the plaintiffs' complaint. However, even though this testimony was erroneously admitted, the dispositive issue is whether its admission constituted reversible error. Rule 45, Ala.R.App.P., provides, in pertinent part, that "[n]o judgment may be reversed or set aside, nor new trial granted in any civil ... case on the ground of ... the improper admission ... of evidence ... unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has *430 probably injuriously affected substantial rights of the parties." After careful review, we conclude that although Grubbs's testimony injected extraneous matters into the trial (matters that were not relevant to the issues presented by the plaintiffs' complaint), we do not believe that this testimony, by itself, was so prejudicial as to necessitate a new trial.
Foremost also contends that the plaintiffs' attorney, through "repeated narrative questions," was "allowed to testify" before the jury. Citing no cases in support, Foremost argues that this form of questioning by the plaintiffs' attorney was prejudicial and requires a new trial. Although Foremost contends that the plaintiffs' improper questioning was pervasive during the trial, the only two questions specifically complained of by Foremost in its briefs were as follows:
"Q.... I don't know all these folks out here. I know a lot of them, but I do know this, and you do too, that there are people watching this trial to see what happens in this case on adjacent structures coverage, and this business of free insurance to see if, in fact, selling through unqualified, untrained folks that don't care about the policyholders, and are simply trying to make that 25 percent commission
"[Foremost's attorney]: (Interposing) Your Honor,
"Q. Isn't that, basicallyyou don't know whether folks have quit that or not do you?
"[Foremost's attorney]: Your Honor, I would object to the question.
"[Plaintiffs' attorney]: Let me rephrase it, ... and I will withdraw it and ask it this way."
"Q. Mr. Johnson, you remember yesterday I asked you to furnish us the report today that Mr. Doug Carmichael claims that he made after he learned about all the wrongdoing that was taking place through dealers there at C & C and other dealers throughout the State? Do you recall that?
"[Foremost's attorney]: I would object to that question as mischaracterizing Mr. Carmichael's testimony. He didn't say that he was aware of all wrongdoing.
"[Plaintiffs' attorney]: Well, I will strike that. He just said part of it.
"[Foremost's attorney]: Your Honor, I would have to object to his making statements that are incorrect and then withdrawing them before the court has a chance to rule on them.
"[Plaintiffs' attorney]: I won't withdraw it, then.
"[Foremost's attorney]: That is improper, Your Honor. And testifyingwhat [the plaintiffs' attorney] is doing is testifying about something that is not correct, and then without the court ruling proceeding to withdraw his question. And, I think that is improper. It is called a testifying question, and we not only ask [the plaintiffs' attorney] to stop doing that, but we ask the court to instruct him not to do it anymore.
"[Plaintiffs' attorney]: Your honor, let me respond. Very simply, the jury remembers what Mr. Carmichael said. Mr. Carmichael testified that he knew what was going on, he suspected fee splitting, he knew that the folks were not licensed; he claimed he tried to get them to license over a period of some six years, I believe....
"....
"[Plaintiffs' attorney]: And, he was unsuccessful in doing so. And, he found out the insurance commissioner had actually made an investigation, he talked about it, the witness has testified to it, and that is what I am asking him about.
"[The Court]: All right, y'all have talked enough. I think I warned y'all about this earlier.
"[Foremost's attorney]: Yes, sir.
"[The Court]: You know, speaking objections is just as bad. So, neither one of y'all do that anymore. Now, go ahead."
As the above quotes illustrate, Foremost objected to both questions. The plaintiffs' attorney withdrew the first question and after Foremost's objection to the second question the trial court appears to have admonished the plaintiffs' attorney to be more careful in *431 asking his questions. In any case, we also note that the trial court instructed the jury very specifically at the close of the case that statements made by the attorneys were not to be considered as evidence. After carefully reviewing these questions in context, we cannot hold that a new trial is required.
Foremost argues that the trial court exhibited hostility and bias toward it during the course of the trial and subsequent posttrial proceedings and that the trial court's conduct requires a new trial. One instance cited by Foremost occurred as the trial court was instructing the jury to disregard Tunstall's "pattern and practice" testimony:
"I had thought at the time when I made the ruling that he had taken him outside after they had finished questioning him. So, that is why I made the ruling, and that is how I made a mistake. I wasn't informed, and, of course, it is my thought, and I'm not putting the blame on everybody else, but, you know how objections are, and how the little boy hollered wolf. When you holler wolf all the time you ain't worried about the wolf, really, you know. But, I let the wolf out, so I'm correcting it at this point and telling y'all to disregard any and all the testimony that Mr. Tunstall gave in your decision of this case."
According to Foremost, this comment conveyed to the jury that its attorneys' objections were somehow improper. Foremost maintains that this "sarcastic" comment by the trial court suggested to the jury that "when [Foremost] made proper objections to improper evidence or questions, a jury could be expected to perceive [it] as acting improperly."
After examining the context in which this statement was made, we agree with Foremost that the comment was uncalled for. Even the plaintiffs concede in their brief "that the trial court's comparison of defense counsel to `the boy who cried wolf may have been improvident." The trial court has a duty to be thorough, courteous, patient, just, and impartial. Allen v. State, 290 Ala. 339, 276 So.2d 583 (1973). Although we agree with Foremost that comments such as this one are not appropriate and could, under certain circumstances, operate so as to have a negative impact on the overall fairness of a trial, we are not persuaded that that was the case here, especially in light of the following instruction that the trial court gave to the jury at the close of the case:
"Now, as I said, it is the lawyer's duty to make such objections as he deems necessary. You should not hold it against or for any side on the fact that they have made a lot of objections or the fact that they failed to make any objections. That is trial strategy amongst the lawyers, that is their business. That is not for you to be concerned with nor for me to be concerned with.
"In excluding the testimony of that gentleman that I excluded today, I made the statement about the wolf getting in the chicken house or something like that. That was kind of made as a joke by me, and to kind of, I guess, to give some reason why I made the mistake, and I should have excluded it and did exclude it. I didn't intend for that in any way to be prejudicial against the defendant Foremost Insurance Company or any other insurance company or to infer that the lawyers should not makeshould not have made the objections or should not have made a number of objections they have. So, don't take from anything that I said or any ruling that I have made on any objections or any side comments that I have made to any of these lawyers to indicate to you that I have any prejudice for or against the plaintiffs or the defendant or that I have any opinion as to what the outcome of this case should be. It is your duty to decide the outcome of the case. It is your duty to reach a verdict."
We note that we have carefully considered the other instances cited by Foremost as indicating open hostility on the trial court's part toward it and its attorneys. Although our examination of the record does cause us to question some of the trial court's comments and actions (e.g., locking one of Foremost's attorneys out of the courtroom for a few minutes while testimony was being taken), we, nonetheless, can find no basis for *432 holding that the trial court's conduct so prejudiced Foremost as to require a new trial.
As to Foremost's contention that the jury's finding of liability was against the weight of the evidence, we note that an order denying a motion for a new trial on this ground will not be reversed, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the reviewing court that it is wrong and unjust. Dorton v. Landmark Dental Care of Tuscaloosa, P.C., 577 So.2d 425 (Ala.1991). As we have noted previously, the evidence was in dispute as to whether Foremost, through C & C and its sales representative, Banks, made misrepresentations and suppressed material information in connection with the plaintiffs' purchase of their mobile home homeowner's insurance. Suffice it to say that the purpose of a jury trial is to resolve such disputes in the evidence. We cannot hold that the jury's finding of liability on Foremost's part was against the weight of the evidence.

Excessiveness of Damages (Issue 7)

(1) Compensatory Damages
Foremost contends that the jury's compensatory damages awards were not supported by the evidence. It argues that those awards indicate bias, passion, or prejudice on the jury's part and that those awards must be reduced on the grounds that they are constitutionally flawed. We agree.
The right to a trial by jury in civil cases is guaranteed by § 11, Alabama Constitution; therefore, a jury verdict will not be set aside unless it is flawed, thereby losing its constitutional protection. Upon finding a verdict to be flawed, the trial court, pursuant to Rule 59(f), Ala.R.Civ.P., and this Court, pursuant to Ala.Code 1975, § 12-22-7, may interfere with it. In considering questions of the adequacy or excessiveness of jury awards, each case must be determined on its own facts. Wilson v. Dukona Corp. N.V., 547 So.2d 70 (Ala.1989).
After carefully reviewing the record, we consider it quite clear that the trial court, as well as all the parties, understand that the compensatory damages awarded by the jury bore no rational relation to the evidence presented. There was no evidence that the Parhams sustained any damage for which compensation was due other than an economic loss of $1,633.50 (the amount of the first year's premium, plus interest) with respect to their misrepresentation claim and $234.80 (the amount of the premiums paid for adjacent structures coverage, plus interest) with respect to their suppression claim. The jury was not instructed that it could award the Parhams damages for mental anguish. Therefore, the $3,500 award of compensatory damages on the Parhams' misrepresentation claim and the $3,000 award of compensatory damages on their suppression claim were clearly excessive. Likewise, there was no evidence that Massey sustained any harm or loss for which compensation was due other than an economic loss of $1,200.93 with respect to her misrepresentation claim (the amount of the first year's premium, plus interest) and $228.50 (the amount of the premiums paid for adjacent structures coverage, plus interest) with respect to her suppression claim. The jury was not instructed that it could award Massey damages for mental anguish. Therefore, the $3,000 award of compensatory damages on Massey's misrepresentation claim and the $3,000 award of compensatory damages on her suppression claim were clearly excessive. Thus, we conclude that the jury's award of compensatory damages was constitutionally flawed; that it therefore lost the presumption of correctness that normally attaches to a jury's verdict; and that each award of compensatory damages is due to be reduced to the amount supported by the evidence.

(2) Punitive Damages

(2)(a) Misrepresentation

I.
Because the jury found for the plaintiffs, we must assume that Banks made the oral misrepresentation, which he denies making, that the first year's insurance premium was free to the Parhams and to Massey. Ms. Parham is a high school graduate and was at the time of trial attending college. Massey *433 received her GED in 1980 and enjoys reading as a hobby. The Parhams and Massey admitted that they executed various documents and received copies of them, including copies of the installment contracts, and that they had ample opportunity to read the installment contracts before signing them. Ms. Parham testified that her installment contract "shows plainly on the front of it the amount being financed included $540 for insurance on [her] mobile home." Massey testified that "it is certainly easy to understand that if you look at [the C & C installment contract,] you can tell that you're paying for... insurance." The installment contracts on the first page provide:

Buyer has the right to obtain insurance through any existing policy or any person of Buyer's choice as well as through Seller. The cost of required insurance and any other property or liability insurance elected by the Buyer for the term(s) disclosed in item 4(a)(1), if procured through Seller is [$540 for the Parhams; $397 for Massey]. Buyer's election to obtain such insurance through Seller is shown by the inclusion of this cost in Item 4(a)(1)."
At Item 4(a)(1) on the Parhams' installment contract, the figure $540 appears. At Item 4(a)(1) on Massey's installment contract, the figure $397 appears.
In addition to the installment contract, the Parhams signed, and were given copies of, a mobile home invoice and bill of sale, which showed "Cost of Insurance 12 months $540.00"; and the $540 was added to the unpaid balance to arrive at the amount to be financed. In addition to the installment contract, Massey signed, and was given a copy of, a mobile home invoice and bill of sale, which showed "Cost of Insurance 12 months $397.00"; and the $397 was added to the unpaid balance to arrive at the amount to be financed.
Even assuming that Banks made the oral misrepresentations, it is clear, given the undisputed facts, that at the time this oral misrepresentation was made to the Parhams the Parhams would not have had a viable cause of action for misrepresentation. Torres v. State Farm Fire & Casualty Co., supra, 438 So.2d at 758-59:
"`Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests. In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances....
"`"If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, `volunti non fit injuria.'"'

'Munroe v. Pritchett, 16 Ala. 785, 789 (1849)."
See the following cases, which all follow Torres on this point: Wilson v. Brown, 496 So.2d 756 (Ala.1986); First National Bank of Mobile v. Horner, 494 So.2d 419 (Ala.1986); Newman v. First National Bank of Mobile, 497 So.2d 106 (Ala.1986); Hughes v. Cloud, 504 So.2d 734 (Ala.1987); Webb v. Reese, 505 So.2d 321 (Ala.1987); Turner v. Landmark Chevrolet, Inc., 514 So.2d 1337 (Ala.1987); Hinson v. Center Court Productions, 514 So.2d 1374 (Ala.1987); Southern Life & Health Ins. Co. v. Smith, 518 So.2d 77 (Ala. 1987); Syx v. Midfield Volkswagen, Inc., 518 So.2d 94 (Ala.1987); Traylor v. Bell, 518 So.2d 719 (Ala.1987); Pranzo v. ITEC, Inc., 521 So.2d 983 (Ala.1988); Cherokee Farms, Inc. v. Fireman's Fund Ins. Co., 526 So.2d 871 (Ala.1988); and Southern States Ford, Inc. v. Proctor, 541 So.2d 1081 (Ala.1989).
On July 28, 1989, by a five-to-three vote of the Justices on this Court, the law of fraud changed. Hickox v. Stover, 551 So.2d 259 (Ala.1989). Therefore, at the time Banks made the oral misrepresentation to Massey (February 5, 1990), it was for a jury to determine whether this oral misrepresentation constituted actionable fraud under the facts.
When the oral misrepresentations were made to the Parhams and Massey, the Alabama Legislature had enacted § 6-11-21, which capped most punitive damages awards *434 at $250,000, and at that time this Code section had not been declared unconstitutional by this Court.
There is nothing that would have constituted notice to Foremost that acts of C & C's employee Banks, relating to Foremost's mobile home homeowner's insurance policies could subject Foremost to punitive damages awards of millions of dollars.

II.
What was the disparity between the actual harm suffered by the plaintiffs and their punitive damages awards?
On the misrepresentation claim, the jury awarded the Parhams $3,500 in compensatory damages and $3,000,000 in punitive damages; this gives a punitive/compensatory ratio of 857 to 1. The trial court purported to reduce the Parhams' compensatory damages to $1,633.50 and their punitive damages to $750,000; that would have given a punitive/compensatory ratio of 459 to 1.
On the misrepresentation claim, the jury awarded Massey $3,000 in compensatory damages and $3,000,000 in punitive damages; this gives a punitive/compensatory ratio of 1,000 to 1. The trial court purported to reduce Massey's compensatory damages to $1,200.93 and her punitive damages to $750,000; that would have given a punitive/compensatory ratio of 624 to 1.
There was no evidence that the Parhams sustained any compensable loss other than an economic loss of $1,633.50. There was no evidence that Massey sustained any compensable loss other than an economic loss of $1,200.93.

III.
Alabama provides a fine of not more than $1,000 for making a fraudulent statement or representation regarding an application for insurance. See Ala.Code 1975, §§ 27-12-23 and 27-1-12.
The jury's punitive damages award to the Parhams and its punitive damages award to Massey, when compared to the maximum fine that could be imposed, both give a ratio of 3,000 to 1. After the trial court's purported reduction, the ratio would have been 750 to 1 for each award.
To sum up, the plaintiffs signed documents that clearly showed the amount of their homeowner's insurance premium and clearly showed that their first year's premium was being financed, and they were given copies of those documents. The oral representation that the plaintiffs would not have to pay the first year's premium would not have afforded the Parhams a cause of action at the time this oral misrepresentation was made to the Parhams (Torres, supra). The plaintiffs were required to have insurance on their mobile homes, and they always had that insurance. The only damage or loss the plaintiffs suffered was an economic loss, which consisted of the first year's insurance premium and interest on that amount from the date of financing to the date of trial (for the Parhams, $1,633.50; for Massey, $1,200.93). The plaintiffs will receive this in compensatory damages. Given this small amount of compensatory damages, however, the costs of litigation for these particular plaintiffs constitutes an important factor in determining the reasonable punitive award. After thoroughly considering all the pertinent factors set out in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and BMW of North America, Inc. v. Gore, ___ U.S. ___, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), we hold that $60,500 is the maximum amount of punitive damages recoverable by the Parhams under their misrepresentation claim. We also hold that $60,500 is the maximum amount of punitive damages recoverable by Massey under her misrepresentation claim. We note that the plaintiffs settled with the defendant C & C, the employer of Banks, who made the misrepresentation, for $42,000 for Massey and $42,000 for the Parhams.

(2)(b) Suppression

I.
How reprehensible was the defendant's suppression of the fact that adjacent structures coverage was included in the plaintiffs' policies and that such coverage could have been dropped and the plaintiffs' premiums reduced approximately $40 a year, if Foremost's underwriters approved dropping *435 this coverage? Neither the Parhams nor Massey inquired about adjacent structures coverage or expressed a desire not to have this coverage. Both the Parhams and Massey were furnished a copy of their mobile home homeowner's insurance policy, which clearly showed that adjacent structures coverage was included. Neither the Parhams nor Massey objected to this. It is possible that there was no actionable tort at the time this matter was allegedly suppressed from the Parhams. See Wilson v. Brown, supra, and Southern Life & Health Ins. Co. v. Smith, supra, which were also inferentially overruled when the law of fraud was changed in Hickox v. Stover, supra (July 28, 1989), which was after the suppression as to the Parhams but before the suppression as to Massey. There was no body of law in existence in this State showing that the activity of the defendant constituted "clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to" either the Parhams or Massey. § 6-11-20(a). Only in the discussion of the sufficiency of the evidence as to suppression in this case did we hold that the conduct of the defendant was or could have been found to be "suppression"; that, in and of itself, was a close question, given this Court's opinion in Lambert v. Mail Handlers Benefit Plan, 682 So.2d 61 (Ala.1996).

II.
What was the disparity between the actual harm suffered by the plaintiffs and their punitive damages awards?
On the suppression claim, the jury awarded both Massey and the Parhams $3,000 in compensatory damages and $4,500,000 in punitive damages; this gives a punitive/compensatory ratio of 1,500 to 1. The trial court purported to reduce the Parhams' compensatory damages to $234.80 and their punitive damages to $2,500,000; that would have given a punitive/compensatory ratio of 10,647 to 1. The trial court purported to reduce Massey's compensatory damages to $228.50 and her punitive damages to $2,500,000; that would have given a punitive/compensatory ratio of 10,941 to 1.

III.
We find no specific civil fine dealing with an insurer's suppression of the extent of coverage. However, if that is a violation of the Insurance Code, the maximum fine would be $1,000. The punitive damages awarded by the jury to the Parhams and to Massey were in a ratio of 4,500 to 1 when compared to the maximum fine that could be imposed. Even after the purported reduction, there would have been a ratio of 2,500 to 1.
Again, to sum up, Foremost was receiving from the plaintiffs premiums for coverage that Foremost should have known the plaintiffs did not want or need. However, the Parhams' compensatory damages award ($234.80) refunds to them the premium for this coverage that they did not want, and this economic loss is the only damage proved by the Parhams. Given this small amount of compensatory damages, however, the costs of litigation for these particular plaintiffs constitutes an important factor in determining the reasonable punitive award. After a consideration of all of the Green Oil and BMW factors, we hold that $114,500 is the maximum amount of punitive damages recoverable by the Parhams under their suppression claim. Massey's compensatory damages award ($228.50) also refunds to her the premium for this coverage that she did not want, and this economic loss is the only damage proved by Massey. Therefore, we hold that $112,500 is the maximum amount of punitive damages recoverable by Massey under her suppression claim.

Conclusion
For the foregoing reasons, the judgment in case number 1950507 is affirmed, conditioned upon the Parhams' accepting a remittitur of all compensatory damages in excess of $1,868.30 and a remittitur of all punitive damages in excess of $175,000. The judgment in case number 1951238 is affirmed, conditioned upon Massey's accepting a remittitur of all compensatory damages in excess of $1,429.43 and a remittitur of all punitive damages in excess of $173,000. The plaintiffs shall, within 28 days after the date of this opinion, file remittiturs with this Court; *436 otherwise, this judgment will be reversed and the cause remanded for a new trial.
1950507 AFFIRMED CONDITIONALLY.[*]
1951238 AFFIRMED CONDITIONALLY.*
HOOPER, C.J., and MADDOX and KENNEDY, JJ., concur.
ALMON, SHORES, and SEE, JJ., concur specially.
COOK, J., concurs in the result.
BUTTS, J., dissents.
ALMON, Justice (concurring specially).
I concur with most of what is said in the majority opinion and write specially to point out that in 1991 I disapproved of this Court's interpretation of our fraud law:
"This is another case in which a plaintiff is attempting to bring a fraud action based on allegations of oral misrepresentations that contradict the plain terms of a written contract, as the plaintiff was allowed to do in Hicks v. Globe Life & Acc. Ins. Co., 584 So.2d 458 (Ala.1991). McAnalley's alleged representations about his commitment to prevent water damage to the house were broader than his promises in the contract, but I do not believe that McCullough should be allowed to contradict the agreement that he signed and thereby to recover in fraud when he cannot recover in contract. McCullough does not argue in his brief that he was fraudulently induced to sign the contract. Absent an allegation of fraud in the inducement, oral contradictions of written contracts are prohibited by the parol evidence rule, and the Statute of Frauds, Ala.Code 1975, § 8-9-2, requires certain contracts, such as those for the sale of any interest in land, to be in writing. These are venerable principles of the common law that serve important purposes in our society; without them, commerce could scarcely take place without continuous disputation. I believe the Court's present course infringes upon those principles.
"As I said in my dissent in Hicks, I now believe that the Court should not have adopted the `justifiable reliance' standard for fraud actions. The `reasonable reliance' standard expresses a flexible concept that this Court applied for many years. See, e.g., Dickinson v. Moore, 468 So.2d 136 (Ala.1985); Arkel Land Co. v. Cagle, 445 So.2d 858 (Ala.1983); Torres v. State Farm Fire & Cas. Co., 438 So.2d 757 (Ala. 1983); Ray v. Montgomery, 399 So.2d 230 (Ala.1980); Franklin v. Nunnelley, 242 Ala. 87, 5 So.2d 99 (1941); Parker v. Ward, 224 Ala. 80, 139 So. 215 (1932).
"Even if McAnalley made the representations that McCullough says he made, it was not reasonable for McCullough to rely on representations that were obviously contrary to the exclusions written into the contract the two had executed for the very purpose of allaying McCullough's concerns about water damage. If McCullough wanted McAnalley's promises to cover improper drainage, he should have insisted on the removal of that exclusion from the contract. McAnalley's superior expertise is a point in McCullough's favor, but the contract is short, simple, typed on McAnalley's stationery, and drafted specifically to the circumstances."
McCullough v. McAnalley, 590 So.2d 229, 235 (Ala.1991) (Almon, J., concurring in part and dissenting in part).
SHORES, Justice (concurring specially).
The justifiable reliance standard adopted by this Court in Hickox v. Stover, 551 So.2d 259 (Ala.1989), permitted a victim of fraud to assume that he was told the truth and permitted him to put his claim before a jury merely by presenting evidence that the defendant *437 had misrepresented the facts. The defendant could escape liability merely by telling the truth. When I voted to concur in Hickox v. Stover, that proposition did not seem unreasonable. It may, however, have been naive. If it is naive to assume that parties to a business transaction will not lie, it is equally naive to assume that misrepresentations are never made in order to defraud.
That said, however, I agree that the Court's departure from the reasonable reliance rule and its adoption of the more subjective justifiable reliance standard may have allowed careless victims of fraud to reach a jury with their claims. It may also have encouraged victims of fraud to avoid discovering potential fraud when it could have been discovered by checking oral representations against the documents memorializing the transaction. It may even, as has been suggested, have encouraged people to falsely accuse another of misrepresenting the facts, in order to bring a lawsuit. It is reprehensible to deliberately misrepresent material facts in order to cheat another. It is equally reprehensible to lie in order to bring a lawsuit. The law can tolerate neither.
For these reasons, I concur in the decision to return to the objective reasonable reliance standard. This standard worked satisfactorily for many years, and it permits the jury to get at the truth and to decide whether both parties acted reasonably under all of the circumstances.
Because courts are made up of human beings, courts sometimes make mistakes. In my opinion, this court made a mistake in departing from a standard in fraud cases that had served well. As a member of the majority that made that departure, I am willing to admit that the rule should not have been changed.
SEE, Justice (concurring specially).
History demonstrates that severing liberties from responsibilities invites social and legal disorder. See generally Edmund Burke, Reflections on the Revolution in France and on the Proceedings in Certain Societies in London Relative to That Event, in III The Works of Edmund Burke 308-11, 314-35 (Boston, Little, Brown, and Co. 1865). Alabama's experience with the "justifiable reliance" standard for fraud is an example of the price paid for severing legal rights from concomitant responsibilities.
To sustain a claim of fraud, the plaintiff must show that he suffered damage as a proximate result of his reliance on a misrepresentation of material fact. Ala.Code 1975, § 6-5-101; Torres v. State Farm Fire & Cas. Co., 438 So.2d 757, 758 (Ala.1983). This Court has adopted two different standards for determining such reliance. For more than a century it applied the "reasonable reliance" standard.[6] In 1989, this Court abandoned that standard for what has come to be called the "justifiable reliance" standard.[7] The choice of standard impacts both *438 the merits of the claim and the time in which the claim must be brought.
With respect to the merits of a fraud claim, the "reasonable reliance" standard affords the buyer the right to rely on a representation only if he fulfills his responsibility, or duty, to exercise ordinary prudence. Bedwell Lumber Co. v. T & T Corp., 386 So.2d 413, 415 (Ala.1980) ("where a party has reason to doubt the truth of the representation or is informed of the [actual] truth before he acts, he has no right to act thereon"). In contrast, under the "justifiable reliance" standard, the buyer has the right to rely on a representation of the seller, but has no correlative duty to act reasonably.[8]Hickox v. Stover, 551 So.2d 259, 263 (Ala.1989) (providing that a particular buyer has the right to rely on a representation of a seller even though a reasonable man would not have so relied).
With respect to the statute of limitations for a fraud claim, the "reasonable reliance" standard requires the buyer to act reasonably to discover fraud. If he does, he has the right, within the applicable limitations period, to bring his claim. See Gonzales v. U-J Chevrolet Co., 451 So.2d 244 (Ala.1984) (providing that the limitations period for fraud begins to run when the plaintiff "should have discovered ... facts which would provoke inquiry by a person of ordinary prudence"). In contrast, the "justifiable reliance" standard effectively affords the buyer the right to assert a fraud claim without the duty to act reasonably to discover the fraud. See Hicks v. Globe Life & Acc. Ins. Co., 584 So.2d 458, 463 (Ala.1991) (stating that unless the particular plaintiff "actually knew" of facts that would have put him on notice of the fraud, the jury decides when the statutory limitations period began to run).
For example, Buyer and Seller voluntarily enter into an arm's length transaction for the purchase of insurance. Buyer wants the most coverage for the least premium, while Seller wants the most premium for the least coverage. The written contract plainly and clearly provides for $9,000 of coverage. Without reading it, Buyer signs the contract. Three years later Buyer suffers a loss, receives $9,000, and files a fraud claim alleging that Seller orally represented that the contract provided $10,000 of coverage. Should a court allow such a claim to go to a jury? "Justifiable reliance" says "Yes." "Reasonable reliance" says "No."[9]
Fundamentally, the question is: Should Buyer's right to rely on Seller's representation be tied to Buyer's duty to take reasonable precautions for himself? Or, should Buyer's right to rely be independent of any duty to act reasonably in his own behalf?
The consequences of severing the buyer's right to rely from his duty to act reasonably can be understood only by examining the dramatic impact that such severance has had both inside and outside the courtroom. First, severing the buyer's right to rely from his duty to act in a reasonable manner has discouraged buyers from reading their contracts. It has reduced the traditional costs associated with such laxity[10] by insulating the buyer from its consequences and by providing *439 an incentive for the buyer to recast his own carelessness as the seller's "fraud." Under this relaxed standard, a jury can permit a buyer, who has negotiated and voluntarily agreed to an express contractual obligation, to escape that obligation based on the mere allegation of a misrepresentation. See Hicks, 584 So.2d at 469 (Almon, J., dissenting) ("The new standard of `justifiable reliance' gives to parties claiming fraud undue leeway to ignore written contract terms and allows in some cases the automatic creation of a jury issue by a plaintiff's statement in contradiction of such written terms.").
Second, the "justifiable reliance" standard has greatly enlarged the potential plaintiff class for fraud actions. It has broadened the plaintiff class to include those who unreasonably relied, as well as those who reasonably relied. See Hickox, 551 So.2d at 263 (allowing plaintiffs who received reasonable notice, but failed to read their contract, to pursue a fraud claim). Also, using the "justifiable reliance" standard to interpret the statute of limitations has expanded the plaintiff class to include not only those who acted reasonably and timely to discover fraud, but also those who failed to act reasonably. See Hicks, 584 So.2d at 464 (allowing plaintiff who had possession of contract for approximately four years, and chose not to read it, to pursue a fraud claim).
Third, the adoption of the "justifiable reliance" standard has deprived trial judges of the summary judgment procedure as a means to eliminate fraud cases that should not consume scarce judicial resources. Under the justifiable reliance standard, both the merits of the reliance and the time of discovery by the buyer have become automatic jury issues. See Hickox, 551 So.2d at 267-68 (Kennedy, J., concurring specially in part; dissenting in part) (arguing in dissent that summary judgment for defendant on statute of limitations issue should be affirmed where the buyer had reasonable noticea written lettermore than two years before filing the action).
Weighed against the cost of requiring buyers to act as reasonable citizens, the cost of the experiment with "justifiable reliance" has been too high. Unbound by the terms of their contracts, unimpeded by any prospect of summary judgment, and lured by the promise of gain,[11] plaintiffs have choked the courts with a flood of fraud litigation. This serves as an example of the price paid for severing rights from concomitant responsibilities. The law should not promote the disorder of profligate litigation or encourage people to enter into contracts for the purpose of acquiring a fraud claim.[12]
Today, this Court returns to the "reasonable reliance" standard to restore the bond between the right to rely and the responsibility to act reasonably.[13]
I concur.
BUTTS, Justice (dissenting).
Although I agree with the majority that the punitive damages awards in this case are excessive and should be remitted, I must nevertheless disagree with the majority's interpretation and application of BMW of North America, Inc. v. Gore, 517 U.S. ___, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). I was not a member of this Court when it issued the original opinion in BMW of North America, Inc. v. Gore, 646 So.2d 619 (Ala. 1994), and I do not believe that today's majority opinion settles, or even addresses, the true issue that the United States Supreme Court has raised in its reversal in Gorehow a defendant may be assured of adequate notice of the conduct that will subject him to punishment and adequate notice of the severity *440 of punishment that he might expect for such conduct. The majority has merely reiterated the elements of Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and I do not agree that doing so provides a correct interpretation of Gore. Moreover, I dissent from the majority's ex mero motu rejection of the justifiable reliance standard in fraud cases and now write to address that issue.

I.
The majority states that the justifiable reliance standard basically eliminates a person's "duty ... to read the documents received in connection with a particular transaction (consumer or commercial)." 693 So.2d at 418. The majority envisions cases where the "party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless [make] a deliberate decision to ignore written contract terms." 693 So.2d at 421. The majority emphasizes that one of the plaintiffs in this case enjoys reading as a hobby, as though this vests her with the abilities of a seasoned attorney; however, unless insurance policies and their language are her literature of choice, it is difficult to see how this hobby would place her on the same level of understanding as the insurance company.
I believe that the majority of this Court simply ignores the commonsense reality that consumers who want to buy insurance, an automobile, or a home must first sign complex documents that have been crafted to favor the party across the table from them. The people who write these documents develop exceptions and exclusions that limit the benefit a consumer will receive from the transaction, and then hide these limitations behind the specialized language of corporate attorneys. It is no surprise that even educated consumers find it difficult to fully understand what they must sign and be bound by; this is precisely why they often rely so heavily upon representations that are made to them as to the meaning of certain terms and provisions, particularly when they are made in a friendly voice and with an assuring smile.
I do not believe that the justifiable reliance standard should take away a consumer's responsibility to prudently conduct his or her business affairs; the consumer should remain alert to obvious falsehoods and should not close his or her eyes to avoid discovery of the truth. Moreover, I recognize that there are instances where a consumer may unfairly or even dishonestly blame an honest businessperson for a misrepresentation, without having attempted to read and understand the document at issue. I do not believe the law should reward consumer dishonesty or place an unfair burden upon one who makes an innocent representation to the consumer. However, there should be a level playing field between those who profit and those who pay, so that the person who has superior knowledge of a document has the duty to tell the truth about it.
In the absence of meaningful statutes to impose criminal or civil punishment for fraud in this state, lawsuits and jury verdicts have become the only means that many consumers have to protect themselves. As I stated in my dissent in Life Ins. Co. of Georgia v. Johnson, 684 So.2d 685, 719 (Ala.1996), "[i]t is clear that Alabama needs stronger consumer protection laws and a realistic means to enforce them." I cited as an example the fact that Alabama's Insurance Department, with a scant budget of less than $2 million, a staff of fewer than 30 professional employees, including only 4 consumer protection specialists, is responsible for regulating Alabama's $6 billion insurance industry, composed of 1100 companies. 684 So.2d at 719. Certainly, most fraudulent acts, and the lawsuits that result from them, would diminish or disappear altogether if simple truth became the order of the day, but this will not happen without action by all three branches of government.
The legislature of this state should recognize fraud as the criminal act and civil wrong that it is, and treat it accordingly. In Alabama there is no real criminal penalty for consumer fraud, and the $2,000 civil fine in the Deceptive Trade Practices Act is not even a slap on the wrist. The legislature should enact meaningful criminal fraud statutes that impose strong punishments and *441 should increase the civil penalty to an amount that will sting when a sting is needed. Of course, any newly enacted criminal and civil fraud laws will succeed when the attorney general's office, and others charged with the responsibility of enforcing our laws, vigorously carry them out. Moreover, the executive branch should include an officer, perhaps even a cabinet member, to lead a consumer protection department in charting a middle ground between the competing interests of businesses and consumers. For too long, the other branches of government have failed to lead the attack on consumer fraud, although they alone have the power to fight it at its source. Instead, the legislative and executive branches have left the judiciary to resolve the disputes that commonsense, visionary leadership could have prevented, and litigation has become the first and only line of defense against consumer fraud. In sum, I believe that if those with the power to do so would arm the State of Alabama with reasonable criminal and civil consumer protection laws and then courageously enforce them, it would finally serve notice that persons who wish to defraud Alabama citizens will do so at their peril.
Until such action is taken, it is left to the courts of this state to fairly resolve the issues of fraud that will continue to arise unabated, and I believe the majority today retreats from that task. When this Court adopted the "justifiable reliance" standard in 1989, it did not break radical new ground in American jurisprudence; rather, it adopted the position that is established in the majority of jurisdictions and that reflects the progressive development of the law of fraud.[14] The Court recognized a modern standard of business ethics that demands that factual statements be made carefully and honestly, so that consumers need not assume that they are consistently being lied to, but may rely upon what they are told unless it is patently false. The majority of this Court now abandons the progress it made and regresses to the law of the 1840's, adopting a standard of business ethics wherein it is assumed that any one may be expected to overreach another in a bargain if he can and that only a fool will expect common honesty. W. Page Keeton et al., Prosser and Keeton on the Law of Torts, § 108, at 751-52 (5th ed.1984) (emphasis added).
As of today, in a state where lawsuits are brought to obtain and force the necessary funding for adequate public secondary education, the majority assumes that a high school graduate is fully capable of understanding the intricacies of documents drawn up by corporate lawyers and is capable of recognizing any and all falsity in statements made to them by those who profit the most *442 from such statements. Even a college graduate, when reading contract provisions such as those stated in the documents appearing as appendices to this special opinion, might naturally look to the party with superior knowledge of the documents and simply ask "What does this mean?" and expect an honest answer.
To the majority of this Court, that expectation of honesty is far too great. The crushing burden of truthfulness that the justifiable reliance standard imposed on the party with superior knowledge of the truth has been lifted and the so-called "balance" is restored; those with greater knowledge and bargaining power are free to lie about the complicated documents that they draft for their profit, and the consumers who are least able to understand the documents are free to catch themif they can.

*443 Appendix A

*444 
*445 
*446 
*447 
*448 
*449 
*450 
*451 
*452 
*453 
NOTES
[1] The sales documents indicate that Massey's premium was $397; her policy states that the premium was $396. Those documents estimated the Parhams' premium to be $540. The actual premium was $499.
[2] The record is not clear as to whether Massey signed her Foremost mobile home homeowner's worksheet.
[3] Peggy Ferrell (spelled "Ferrell" in the record;" "Farrell" in the plaintiffs' brief), a customer relations manager for Foremost, testified in pertinent part as follows:

"Q. All right. You are familiar with policies that your company writes on mobile homes aren't you?
"A. Yes, I am.
"Q. Could adjacent structures coverage have been removed from policies sold to Ms. Massey and Ms. Parham?
"A. It could be removed with permission of underwriting.
"Q. Do you recall what you told us on your deposition, and I'm not going to spend all day going back and forth on this, but do you remember you told us no?
"A. Yes, I remember that. There is a reason for that, that I would like to explain.
"THE COURT: Go ahead.
"A. The reason is that if an insured desires coverage that is not inthat does not have Foremost Insurance or rather does not have adjacent structures, we would put them in a program that does not have that.
"....
"A. Typically, what we do if thethat is the secondary program if the insured is adamant that they don't want that policy number changed, we can remove the coverage from the program that they are in with permission.
"Q. What if they didn't even know that they had adjacent structures coverage at all, if the agent didn't explain it to them that sold it to them?
"A. I wouldn't know ifhow that had occurred. The policy clearly [points] out they have the coverage.
"Q. In fact, they bought a package deal didn't they?
"A. Yes, they did.
"Q. And their package included adjacent structures coverage?
"A. Yes.
"Q. And if they didn't have adjacent structures on their property they still had adjacent structure coverage?
"A. That would be true if they didn't have adjacent structures.
"Q. And they paid a premium for it every year, am I correct on that?
"A. Yeah.
"Q. At the time they bought their policy, could both Ms. Parham and Ms. Massey have obtained a policy without adjacent structures coverage?
"A. Yes.
"....
"Q. Okay. Do you believe that a customer always has the option to either take adjacent structures coverage or not?
"A. Yes, they would have had that option.
"...
"Q. Would you recall on Ms. Massey whether or not she could have purchased the optional coverage?
"A. I don't understand your question.
"Q. Could Ms. Massey have bought a policy without adjacent structures coverage?
"A. Yes."
[4] The evidence was in dispute as to the exact percentage of those mobile home homeowners who were shown as not having certain adjacent structures. The survey itself was not admitted into evidence. Testimony at trial indicated that the mobile home homeowners surveyed were asked, "What is the approximate total value of all structures which are not attached to your mobile home, such as a shed, garage, satellite dish, barn, et cetera?" Those surveyed were to respond to this question by placing a dollar amount on the appropriate line or by checking a box that said "have no other structure." On examination by the plaintiffs' attorney, Foremost's designated corporate representative, John Johnson, indicated that the percentages of those mobile home homeowners who did not have certain adjacent structures in 1987 and 1990 were in excess of 50% (specifically, 56% in 1987; 66% in 1990). However, on examination by Foremost's attorney, Johnson indicated that the mobile home homeowners who did not have certain adjacent structures in 1987 and 1990 were in the 40% to 41% range.
[5] The Manning Agency was also named as a defendant and the jury awarded the Parhams $3,500 in compensatory damages on their misrepresentation claim and $3,000 in compensatory damages on their suppression claim against that defendant. The jury also awarded Massey $3,000 in compensatory damages on her misrepresentation claim and $3,000 in compensatory damages on her suppression claim against the Manning Agency. The jury assessed no punitive damages against the Manning Agency, and it did not appeal.
[*] Note from the Reporter of Decision: On June 3, 1997, the Supreme Court issued certificates of judgment in these two cases, following the plaintiffs' filing of remittiturs. In case 1950507 the Court entered this order:" IT IS NOW CONSIDERED, ORDERED AND ADJUDGED that the judgment of the circuit court be reduced to $176,868.30 and as thus reduced, the judgment of the circuit court is hereby affirmed, with interest and costs." In case 1951238 the Court entered this order: "IT IS NOW CONSIDERED, ORDERED AND ADJUDGED that the judgment of the circuit court be reduced to $174,429.43 and as thus reduced, the judgment of the circuit court is hereby affirmed, with interest and costs."
[6] As Justice Houston points out, Alabama courts employed the objective "reasonable reliance" standard for fraud actions until 1989. See, e.g., Torres v. State Farm Fire & Cas. Co., 438 So.2d 757 (Ala.1983) (applying "reasonable reliance" standard to affirm summary judgment against plaintiffs who, had they acted reasonably, would have discovered the truth); Munroe v. Pritchett, 16 Ala. 785, 789 (1849) (embracing "reasonable reliance" standard by stating that a purchaser has no "right to rely" on representations where "the purchaser, had he exercised ordinary prudence, could have attained correct knowledge").
[7] Hickox v. Stover, 551 So.2d 259 (Ala.1989) (adopting "justifiable reliance" standard to reverse summary judgment for defendants where plaintiffs did not check on the value of insured property when told to do so by the defendant's agent). I note that the majority of our neighboring states has avoided Alabama's unfortunate experience by retaining the objective "reasonable reliance" standard, instead of adopting the subjective standard that we have labelled "justifiable reliance." Compare Garcia v. Charles Evans BMW, Inc., 222 Ga.App. 121, 473 S.E.2d 588, 590 (1996) (upholding defendant's summary judgment on fraud count where plaintiff failed to read the contract); Winstead v. First Tennessee Bank N.A., Memphis, 709 S.W.2d 627, 631 (Tenn. App.1986) (stating that where ordinary diligence would have uncovered a problem, buyer cannot attack the validity of the contract on the basis of fraud); and Taylor v. Kenco Chemical & Mfg. Corp., 465 So.2d 581, 586 (Fla.Dist.Ct.App.1985) (stating that buyer could not recover punitive damages for fraud where he had the clear opportunity to read the contract) with Godfrey, Bassett & Kuykendall Architects, Ltd. v. Huntington Lumber & Supply Co., 584 So.2d 1254, 1259 (Miss. 1991) (allowing buyer to bring fraud claims regarding addendum to contract after buyer signed contract without reading to see if addendum had been included).
[8] The "justifiable reliance" standard shifts the duty to safeguard the buyer's interests from the buyer to the seller and emphasizes the facial falsity of the seller's representation. See Harris v. M & S Toyota, Inc., 575 So.2d 74, 77-78 (Ala.1991) ("the new standard of justifiable reliance places a burden on the party making the statementthe burden of knowing the truthfulness of a statement"); Southern States Ford, Inc. v. Proctor, 541 So.2d 1081, 1088 (Ala.1989) (Hornsby, C.J., concurring specially) (stating that the justifiable reliance standard merely requires a plaintiff not to rely on "patently ridiculous representations" such as promises of the "moon").
[9] This assumes, of course, that Buyer does not fall within that narrow class of consumers that, through lack of education, physical infirmity, or other cause, cannot understand their contracts. See, e.g., Lloyd v. Jordan, 544 So.2d 957 (Ala. 1989); Webb v. Reese, 505 So.2d 321 (Ala.1987); Williamson v. Matthews, 379 So.2d 1245 (Ala. 1980).
[10] See 3 Arthur Linton Corbin, Corbin on Contracts § 607, at 656 (1960) (reciting the traditional standard for unilateral mistake that "[o]ne who signs or accepts a written instrument without reading it with care is likely to be surprised and grieved at its contents later on").
[11] See generally Green Oil Co. v. Hornsby, 539 So.2d 218, 223 (Ala.1989) (providing that the size of punitive damages awards should "encourage plaintiffs to bring wrongdoers to trial").
[12] See Southern States Ford, Inc. v. Proctor, 541 So.2d 1081, 1088 (Ala.1989) (Hornsby, C.J., concurring specially) ("Alabama courts should not serve as the means for advancing such `counterschemes.'").
[13] See Torres, 438 So.2d at 758-59 ("Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interest, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests.") (emphasis added).
[14] A majority of jurisdictions utilizes the "justifiable reliance" standard as one of the elements of a fraud claim. See Barber v. National Bank of Alaska, 815 P.2d 857 (Alaska 1991); Calandro v. Parkerson, 936 S.W.2d 755 (Ark.1997); Alliance Mortgage Co. v. Rothwell, 10 Cal.4th 1226, 44 Cal.Rptr.2d 352, 900 P.2d 601 (1995); Robert K. Schader, P.C. v. Etta Industries, Inc., 892 P.2d 363 (Colo.App.1994); Zirn v. VLI Corp., 681 A.2d 1050 (Del.Supr.1996); Thor Bear, Inc. v. Crocker Mizner Park, Inc., 648 So.2d 168 (Fla.App.1995); Hanlon v. Thornton, 218 Ga.App. 500, 462 S.E.2d 154 (1995); Weber v. DeKalb Corp., 265 Ill.App.3d 512, 202 Ill.Dec. 155, 637 N.E.2d 694 (1994), appeal denied, 158 Ill.2d 566, 645 N.E.2d 1369, 206 Ill.Dec. 847 (1994); Carlson v. Vondrak, 555 N.W.2d 238 (Iowa App.1996); Seigle v. Jasper, 867 S.W.2d 476 (Ky.App.1993); Dousson v. South Central Bell, 429 So.2d 466 (La.App. 1983); McCarthy v. U.S.I. Corp., 678 A.2d 48 (Me.1996); Tytel v. Massachusetts Mut. Life Ins. Co., 104 Md.App. 765, 1995 WL 551268 (1995); Cormack v. American Underwriters Corp., 94 Mich.App. 379, 288 N.W.2d 634 (1979); Florenzano v. Olson, 358 N.W.2d 175 (Minn.App.1984), reversed on other grounds, 387 N.W.2d 168 (Minn.1986); Mark Twain Kansas City Bank v. Jackson, Brouillette, Pohl & Kirley, P.C., 912 S.W.2d 536 (Mo.App.1995); Cechovic v. Hardin, 273 Mont. 104, 902 P.2d 520 (1995); Blanchard v. Blanchard, 108 Nev. 908, 839 P.2d 1320 (1992); Bronstein v. GZA GeoEnvironmental, Inc., 140 N.H. 253, 665 A.2d 369 (1995); Barry L. Kahn Defined Benefit Pension Plan v. Township of Moorestown, 243 N.J.Super. 328, 579 A.2d 366 (1990); Ruiz v. Garcia, 115 N.M. 269, 850 P.2d 972 (1993); Landes v. Sullivan, 651 N.Y.S.2d 731 (N.Y.App.Div.1997); Helms v. Holland, 478 S.E.2d 513 (N.C.App.1996); Burr v. Board of Comm'rs of Stark County, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986); Mallette v. Children's Friend & Service, 661 A.2d 67 (R.I.1995); Forsberg v. Burningham & Kimball, 892 P.2d 23 (Utah App. 1995); Silva v. Stevens, 156 Vt. 94, 589 A.2d 852 (1991); Martin v. Era Goodfellow Agency, Inc., 188 W.Va. 140, 423 S.E.2d 379 (1992); Chitwood v. A.O. Smith Harvestore Products, Inc., 170 Wis.2d 622, 489 N.W.2d 697 (Wis.App.1992), review denied, 494 N.W.2d 210 (Wis.1992); Rissler & McMurry Co. v. Sheridan Area Water Supply Joint Powers Board, 929 P.2d 1228 (Wyo.1996).