The parties are at odds over the sale of a house coupled with an agreement for the sellers' repurchase of the house under certain terms and conditions. The sellers, Dr. Kanai Lal Pal and his wife Padma Rani Pal, as plaintiffs, won a jury verdict, and the trial court entered a judgment on it against Samuel Jones Cassels and his wife Martha B. Cassels, the buyers, as defendants, for $328,150 on a claim of breach of contract and $25,400 on a claim of conversion. The Casselses appeal this judgment, and the Pals cross-appeal an adverse judgment as a matter of law entered by the trial judge on the Pals' fraud claim before he submitted the other two claims to the jury. We reverse the judgment against the Casselses and remand this cause. We affirm the judgment as a matter of law entered against the Pals on their fraud claim.
The Pals are natives of India. They and their two sons are visiting the United States on visas. While the record reveals that the Pals speak only broken English, the Pals do not claim any difficulty in reading and comprehending written English or in hearing and comprehending spoken English. The Pals are both well educated.
Before the inception of the transaction and dispute between the Pals and the Casselses, the Pals had bought, for a price of $30,000, a house in Montgomery from owners not involved in this litigation. The Pals used the house as a residence for their two sons, who were students. The Pals themselves lived somewhere else, not material to this litigation.
When the Pals developed a need for some money, one of their sons introduced them to Mr. Cassels, who agreed, in effect, to broker a bank loan for the Pals, secured by a mortgage on the house, and to manage the house as rental property for the Pals to repay the bank loan. The form of the transaction was a sale of the house by the Pals to the Casselses and an agreement for the Pals to repurchase the house from the Casselses under certain terms and conditions. Coordinately with the Pals' sale of the house to the Casselses, the Casselses borrowed $25,900 from Central Bank; mortgaged the house to Central Bank to secure the loan; and directed Central Bank to pay $20,000 of the loan proceeds to the Pals, to apply $4,356.70 of the loan proceeds to discharge a debt owed by the Casselses themselves, and to apply the remainder of the loan proceeds to the closing costs. The application of the $4,356.70 to discharge the Casselses' own debt appears to be their major benefit from the entire transaction.
The Pals' sons vacated the house and the Casselses rented the house to various tenants, for rentals ranging between $350 and $450 per month. From these rentals the Casselses paid the monthly installments on the note to Central Bank and, according to the Pals' own complaint, also paid for "repairs in the approximate amount of $5,000" and had a "negative cash flow . . . of approximately $3,500," an amount the Pals assert in their complaint is "disputed" but concede was paid from the rentals.
In October 1995, after the Casselses had collected about $38,000 in rentals, and when the mortgage note still required about seven years of monthly installments, the Pals demanded the reconveyance of the house to the Pals, and the Casselses refused the demand. The record does not contain evidence of any other details or terms of the demand or the refusal, although the Pals, through counsel, pleaded and argued that the Casselses counterdemanded *Page 950 
that the Pals pay the Casselses an additional $15,000 or $20,000 for the reconveyance.
The Pals sued the Casselses. The parties drafted, and the trial court entered, a pretrial order, which states the Pals' claims in these words:
 "Count One: Conversion; Defendants converted to their own use rental income received on property located at 2312 East Fifth Street.
 "Count Two: Breach of Contract; Defendants breached the said agreement by refusing upon demand to transfer title to the property to the Pals upon completion of the terms set out in the agreement.
 "Count Three: Fraud; Plaintiffs were led to believe that the house would be transferred to them upon payment of $20,000 cash, inclusive of rental payments received as well as closing costs of two transfers, plus maintenance charges."
The trial judge submitted the Pals' contract and conversion claims to the jury in essentially the same words. Before the trial judge submitted the case to the jury, however, the judge entered a judgment as a matter of law against the Pals on the fraud claim on the ground that it was barred by the statute of limitations because the Pals should have discovered what they characterize as fraud more than two years before they filed suit in 1996. At the appropriate times during and after trial, the Casselses moved for a judgment as a matter of law on the Pals' contract and conversion claims as well, but the trial judge denied the motions as they applied to these two claims. This appeal and cross-appeal followed the verdict and judgment in favor of the Pals and the denial by operation of law of the Casselses' postjudgment motion.
The terms and conditions of the transaction are contained in a written contract executed between the Pals and the Casselses. Because the written contract contains a reference to the mortgage to the bank and governs the repayment of the secured loan, the terms of the note and the mortgage are part of the contract between the Pals and the Cassels. See Ex parteAmerican Gen. Fin., Inc., [Ms. 1990532, December 1, 2000], ___ So.2d ___ (Ala. 2000). The contract reads:
 "Agreement of sale of Lot 7, Block 17 of the Uplands, commonly known as 2312 East Fifth Street, Montgomery, Alabama 36106.
"Part 1
 "Kanai Lal Pal and Padma Rani Pal, husband and wife and Deepak Pal, their son, agree to transfer title to said property to Martha B. Cassels and Samuel Jones Cassels, III, the husband and wife, for $20,000 (twenty-thousand dollars and no cents).
"Part 2
"Instructions to the closing attorney:
 "1. $20,000 to be given to the Pals. Check to be executed to Kanai Lal Pal and Padma Rani Pal. Deepak Pal is presently out of the country and is not here to endorse the check. Parents will send his portion to him by certified check.
 "2. Costs of closing will be paid from the loan proceeds.
 "3. Balance of loan proceeds to be made payable to Central Bank, payment on loan number 002 81 601 5753 7.
"Part 3
 "Title to Lot 7, Block 17 of the Uplands will be transferred to the Pals upon the payment of $20,000 cash plus costs of sale closed on September 18, 1987, plus all maintenance charges accrued to the *Page 951 
house during the time title is held by the Cassels plus all charges of the transfer. Maintenance charges are defined as follows:
 "This house will be managed by the rental division of Cassels Real estate in the same manner as if title was still held by the Pals. Monthly accounting will be done. A 10% management fee will be charged. Rents collected will be credited and expenses of repair and maintenance will be debited. All negative cash flow will be paid by the Cassels. But at the time of transfer, this negative must be paid in full to the Cassels.
 "If the $20,000 plus the maintenance charges plus costs of two title transfers are insufficient to pay off the mortgage to Central Bank, the Cassels agree to pay up to, but not more than $2,000 (two thousand dollars) to complete the pay off of the mortgage.
 "All covenants, promises and understandings written herein survive the closing. All rights, privileges, obligations and duties hereby granted or assumed shall inure to the benefit of and shall be binding upon successors, assigns, heirs, administrators and executors of the parties hereto.
 "This agreement is valid and binding through midnight December 31, 1997."
(Emphasis added.) The emphasized portion of the contract is especially critical to the resolution of this case.
This contract was drafted by the Casselses. On the one hand, the language of the contract implicitly requires application of the "maintenance charges" to the mortgage, and the definition of "maintenance charges" includes both the Casselses' 10% management fee and the "expenses of repair and maintenance." The Pals, however, have not contended at any stage of the proceedings that the Casselses' 10% management fee or their reimbursement for the expenses of repair and maintenance should be applied to the mortgage note. Apparently this implication in the language of the contract is an anomaly that neither set of parties intended. Likewise, the Pals have not contended at any stage of the proceedings that "the costs of two title transfers" are required by the contract to be applied to the mortgage note in accordance with the language in the contract implicit to this effect. On the other hand, the Pals testified repeatedly that they expected the rents collected toward the $20,000 figure in the contract to be applied, in turn, to the debt on the mortgage note. The contract does plainly, albeit implicitly, require this application of those rents. The contract expressly limits the Casselses' obligation on the mortgage note to $2,000 from their own funds aside from rents.
The principal of the promissory note by the Casselses to Central Bank was, as already mentioned, $25,900. The note provided for interest at a variable rate, beginning at 9.89%, consisting of 3.25 percentage points above an index rate of 6.64%. The note provided that variations in the index rate from year to year would increase or decrease the interest rate but that the interest rate would "not exceed 14.89% nor go below 8.00%." The note further provided:
"Adjustable Payments
 "My monthly payment amount will adjust each year during the term of this note in order that I might repay the amounts due under this note by September 21, 2002, which is the maturity date on this note.
"(A) AMOUNT OF MONTHLY PAYMENTS; PAYMENT ADJUSTMENTS
 "My first twelve (12) monthly payments will be in the amount of $276.58 (the `Beginning Monthly Payment'). *Page 952 
Each year, after Lender has received my 12 previously scheduled payments, the Lender will use the balance due under this note and the interest rate applicable to this note at that time to calculate my adjusted monthly payment amount.
"(B) LIMITATION ON PAYMENT ADJUSTMENTS
 "Any increase in my monthly payment amount will be limited to ten percent (10%) of the previously scheduled monthly payment amount. This limitation on increases in my monthly payment amount does not apply at the time of final payment adjustment, or if the balance due under this note exceeds 115% of the original principal sum.
 "Decreases in my monthly payment amount will be made as provided in Section 3(A) above; however, in no event will my adjusted monthly payment be less than the Beginning Monthly Payment. This limitation on decreases in my monthly payment amount may result in an earlier maturity date for this note."
The note allowed prepayment without penalty.
No one contended at any point in the proceedings that the note was in default. No party introduced any evidence of any increase or lack of increase in the amount of any monthly installment. The Pals did not prove any decrease in the interest rate which could have advanced the time of satisfaction of the note. Likewise, the Pals did not prove that the interest rate had not increased so much that the interest by itself had consumed most or all of the monthly installments or even had accumulated a growing balance of unpaid interest in addition to the original principal. The record is devoid of evidence that the note had been satisfied either by the time of the Pals' demand for reconveyance of the house or the time of the trial itself.
The mortgage securing the promissory note to Central Bank contains a due-on-sale clause which provides that the Bank could demand and collect the entire secured balance upon any conveyance of the house by the mortgagors, the Casselses. While both the Pals and the Casselses now argue on appeal that the contract between them contemplated that the Pals would assume the mortgage for any balance remaining on the note at the time of reconveyance of the house from the Casselses to the Pals, neither set of parties pleaded, proved, or even argued any such proposition at trial. Likewise, the record is devoid of evidence that anybody negotiated from the bank any waiver of the due-on-sale clause or any permission for, consent to, or approval of any reconveyance of the house by the Casselses to the Pals or any assumption of the mortgage by the Pals.
At trial the Pals argued that the contract entitled them to a reconveyance of the house as soon as the rents collected were sufficient to pay the $20,000, the two sets of closing costs, the Casselses' expenses of maintenance and repairs to the house, and the Casselses' 10% management fee. The Pals contended that the $38,000 in collected rents was sufficient to pay these particular sums. The Pals further argued that their right to reconveyance was not conditioned on the payment of the remaining balance of the mortgage note either by the Pals or from any further rents. The Casselses responded with the argument that their obligation to reconvey the house to the Pals was further conditioned at least upon the payment of the remaining balance of the mortgage note either by the Pals or from future rents, except for the $2,000 which the contract obligated the Casselses to contribute from their own funds aside from rents. The *Page 953 
Casselses contended, and still contend on appeal, that, because the Pals did not prove or tender the payment of the remaining balance of the mortgage note minus the $2,000 to be contributed by the Casselses apart from rents, the Casselses' obligation to reconvey to the Pals never quickened. The Casselses' interpretation of the contract, at least to this extent, is correct.
Had the Casselses reconveyed the house to the Pals upon the Pals' 1995 demand without completing payment of the mortgage note to the bank, the due-on-sale clause in the mortgage would have entitled the bank to demand and to collect the entire balance immediately, by foreclosure on the house if necessary. The only sums the contract (interpreted as explained above) requires the Casselses to apply to payment of the mortgage note are the $20,000 and the $2,000 of the Casselses' own money specified by the contract. Obviously these sums would not suffice to discharge the entire mortgage note obligation consisting of the principal of $25,900 plus interest accrued over about eight years at a substantial variable rate on the unpaid balance. The Pals offered no evidence that these sums would suffice. Indeed, the Pals did not argue that enough of the $38,000 in collected rents should still have remained to pay any major part of the future seven years of installments on the mortgage note. They argued simply that they were entitled to the reconveyance as soon as the total of the rent collections equalled the $20,000, the 10% management fee, the two sets of closing costs, and the then-accrued maintenance and repair costs. While $38,000 did equal or exceed these sums, the contract could not contemplate, and the Pals would not expect or accept, a reconveyance that would provoke an immediate foreclosure on the house to collect the unpaid balance of the note. The Pals themselves had no money to apply to the balance.
Under these circumstances, the only reasonable interpretation of the contract is that it required the continued application of rents to the balance of the mortgage note until the balance was no greater than the $2,000 the Casselses agreed to contribute apart from the rents. Any excess of rent receipts for any month over the mortgage note installment for that month and sums due the Casselses for their own account either would be applied to prepayments on the mortgage note or would be accumulated for a final payoff. Because the record does not contain substantial evidence that enough rents had accrued to discharge the entire mortgage note minus the $2,000 to be contributed by the Casselses apart from rentals and to pay the Casselses the acknowledged 10% management fee, maintenance and repair expenses, and closing costs due them under the contract, the Casselses were due a judgment as a matter of law on the contract count.
The Pals' conversion theory is that the "[d]efendants converted to their own use rental income received on [the] property." Essential to a conversion would be some wrongful taking, wrongful retention, or misapplication of specifically identifiable personalty. Huntsville GolfDev., Inc. v. Ratcliff, Inc., 646 So.2d 1334 (Ala. 1994); and Gillis v.Benefit Trust Life Ins. Co., 601 So.2d 951 (Ala. 1992). As already demonstrated, the contract between the Pals and the Casselses contemplates that the rental income would be applied by the Casselses to the Pals' obligations specified by the contract, that the rents applied to one of those obligations — the $20,000 obligation — would, in turn, be applied to the mortgage note, and that, after satisfaction of the fixed obligations recited in the contract — the $20,000 and *Page 954 
the two sets of closing costs — the rents would continue to be applied to the continuing expenses — the Casselses' 10% management fee and the maintenance and repair costs — and to the balance of the mortgage note until all but $2,000 of the balance was paid. No substantial evidence of record tends to prove that the Casselses received any rents in excess of all of these requirements for the rents. Likewise, no substantial evidence of record tends to prove that the Casselses wrongfully took, wrongfully retained, or misapplied any of the rents. While the Pals pleaded in their complaint and argued during trial that any rents applied to the mortgage note were misapplied, the terms of the contract itself defeat this argument. Indeed, the Pals both expressly testified that, in negotiating the transaction with the Casselses, the Pals understood that the rents would be applied to the mortgage note for 120 months. Because no substantial evidence of record tends to prove any wrongful taking, wrongful retention, or misapplication of any of the rents, the Casselses were entitled to a judgment as a matter of law on the Pals' conversion claim. Because we reach this conclusion, we pretermit any analysis of whether the rents, in the context of the Casselses' duties under the contract, could, in law, be the object of the tort of conversion.
Finally, the Pals' fraud theory, the subject of their cross-appeal, is that, "Plaintiffs were led to believe that the house would be transferred to them upon payment of $20,000.00 cash, inclusive of rental payments received as well as closing costs of two transfers, plus maintenance charges," without any condition that any more of the balance of the mortgage note be satisfied from rents. The trial judge held as a matter of law that the two-year statute of limitations barred the Pals' fraud claim because they should have discovered it from a dispute between them and the Casselses over their retention or loss of the Pals' passports, visas, and airline tickets, more than two years before the Pals filed suit. The dispute over the Pals' passports, visas, and airline tickets is not even mentioned in any of the parties' pleadings. While we conclude that this dispute was immaterial to the Pals' fraud claim and to the issue of their discovery of fraud, we nonetheless also conclude that the ruling of the trial court was right on the basis of a different rationale supported by the record. A ruling of a trial court, right for any reason supported by the record, should be affirmed on appellate review. Ex parteRyals, 773 So.2d 1011 (Ala. 2000); Premier Chevrolet,Inc. v. Headrick, 748 So.2d 891 (Ala. 1999); and Smith v.Equifax Servs., 537 So.2d 463 (Ala. 1988).
 "The question of when a plaintiff should have discovered fraud should be taken away from the jury and decided as a matter of law only in cases where the plaintiff actually knew facts that would have put a reasonable person on notice of fraud. See, e.g., Sexton v. Liberty National Life Ins. Co., 405 So.2d 18
(Ala. 1981); Seybold v. Magnolia Land Co., 376 So.2d 1083
(Ala. 1979). In Seybold, the Court stated that `[i]t is sufficient to begin the running of the statute of limitations that [the] claimant knew of facts which would put a reasonable mind on notice of the possible existence of fraud.' 376 So.2d at 1087 (citing Jefferson County Truck Growers Ass'n v. Tanner, 341 So.2d 485, 488 (Ala. 1977) (plaintiff had actual knowledge of facts sufficient to provoke inquiry by a reasonable person). (Emphasis added.)"
Hicks v. Globe Life Acc. Ins. Co., 584 So.2d 458, 463 (Ala. 1991), overruled by Foremost Ins. Co. v. Parham, 693 So.2d 409 *Page 955 
(Ala. 1997).[1] The Pals had actual knowledge of facts which do satisfy the Hicks test for a judgment as a matter of law on the statute of limitations issue. Unlike the plaintiff in Hicks, the Pals themselves signed the document critical to their case — the one-page contract between them and the Casselses. Reasonable persons would have read this short document, which discloses the mortgage. The Pals both attended the closing of their conveyance of the house to the Casselses, the Casselses' loan from the bank, and the Casselses' mortgage of the house to the bank. There the Pals learned the principal amount of the bank loan to the Casselses — $25,900 — and reconfirmed the portion the Pals were receiving — $20,000. The closing officer explained the terms of both the promissory note and the mortgage while the Pals were sitting two feet from him. On the one hand, the Pals paid no attention to the closing officer's explanation because they deemed that it did not concern them. On the other hand, they knew what he was explaining, and reasonable persons would have paid attention because he was explaining an element of their contract with the Casselses. These facts were "sufficient to provoke inquiry by a reasonable person" as to whether the mortgage would impede the reconveyance of the house on the schedule allegedly represented to the Pals by the Casselses. Thus the Pals "actually knew of facts that would have put a reasonable person on notice of fraud" at the time of the closing, over eight years before they filed suit against the Casselses. Accordingly, the trial court was correct in ruling that the two-year statute of limitations barred the Pals' fraud claim.
Because the trial court properly entered the judgment as a matter of law in favor of the Casselses on the Pals' fraud claim, that ruling is affirmed upon the Pals' cross-appeal. Because the Casselses were likewise entitled to a judgment as a matter of law on the Pals' contract claim and conversion claim, the judgment against the Casselses is reversed and this cause is remanded for an order or proceedings consistent with this opinion.
1980531 — REVERSED AND REMANDED.
1980583 — AFFIRMED.
Houston, Lyons, Brown, and Woodall, JJ., concur.
[1] Because the Pals filed suit before March 14, 1997, the applicable standard for determining when the statute of limitations period began to run on their fraud claim is provided by Hicks. Ex parte American Gen.Fin., Inc., supra.